**FLAVOR CORPORATION OF AMERICA, Plaintiff-Appellee and Cross-Appellant,**

v.

**KEMIN INDUSTRIES, INC., and Rolland W. Nelson, Defendants-Appellants and Cross-Appellees.**

Nos. 73–1338, 73–1339 and 73–1519.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 19, 1973.

Decided March 11, 1974.

Rehearings and Rehearings En Banc Denied April 10, 1974.

William E. Lucas, Chicago, Ill., for Flavor Corp. of America.

Donald H. Zarley, Des Moines, Iowa, for Kemin Industries, Inc.

Before LAY, BRIGHT and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

This is an appeal and cross-appeal from the order of the District Court granting limited injunctive relief in favor of appellee Flavor Corporation of America (FCA), holder of the registered trademark "PESTLUR", and against appellant Kemin Industries, Inc. (Kemin), holder of the common law trademark "LURE".[1]

The trial court found that Kemin had adopted its "LURE" mark in good faith without prior knowledge of FCA's "PESTLUR" and had acquired superior common law trademark rights in ten states prior to the registration of "PESTLUR". "PESTLUR" was held to be a descriptive mark which had acquired a secondary meaning both before and after registration in Georgia and Florida. The court accepted a prior determination by the Court of Customs and Patent Appeals (CCPA) that the marks were so confusingly similar as to cause a likelihood of confusion, but found that Kemin's "LURE" mark as used in commerce infringed FCA's "PESTLUR" only in Georgia and Florida. The court enjoined Kemin from using its "LURE" mark for animal and rodenticide feed flavorings in competition with "PESTLUR" in those two states and later construed the order to prohibit Kemin from advertising in national periodicals which might reach potential customers there.

Both parties have raised numerous arguments on this appeal, but the principal issues are: (1) whether a finding of the Court of Customs and Patent Appeals in a trademark cancellation proceeding operates as collateral estoppel in a subsequent trademark infringement action; and (2) whether FCA's "PESTLUR" mark is descriptive of a flavoring additive for rodenticides designed to attract pests rather than a fanciful mark entitled to incontestable status under the Lanham Act, 15 U.S.C. § 1065. We conclude that the trial court's determination of these issues was correct and affirm. Judge William C. Stuart's well reasoned opinion is reported at 358 F. Supp. 1114 (S.D.Iowa 1973).

FCA and Kemin both manufacture flavor additives for animal feeds and rodenticides. The portion of their businesses devoted to rodenticide flavorings is very minor compared to their animal feed flavoring business. FCA was organized in 1946 and began producing flavorings for animal feeds for which it used the trademark "NECTAR". In 1956, it added "PESTLUR", a flavor additive for rodenticides and pesticides.[2] FCA's total sales of "PESTLUR" between 1956 and 1971, when this action was filed, amounted to $17,013.

Rolland Nelson worked as a regional sales manager for FCA from 1958 until the end of 1961, serving as acting sales manager for the entire operation during the last few weeks of his employment. Nelson left FCA to form Chemical Industries, Inc. in early 1962; the name was later changed to Kemin Industries. Kemin sold the same type products as FCA and was in competition for the same class of customers. At the outset of its operation, Kemin adopted the trademark "LURE" for its animal flavoring additives, which it used with specific animal products, i. e., "PIG LURE", "CATTLE LURE", "CAT LURE", etc. Kemin also produced "RAT LURE", a flavoring additive for

1. Rolland W. Nelson, president of Kemin Industries, was individually named a defendant and joins Kemin as appellant-cross-appellee in this appeal.

2. "RODENTLUR" and "FISHLUR" were added to FCA's product line in 1961. A product bearing the "FISHLUR" mark was first sold in 1962. These two marks are not in issue here since the CCPA declined to consider these marks in the cancellation case. Kemin Industries, Inc. v. Flavor Corp. of America, 440 F.2d 1375, 1377, 58 CCPA 1180 (1971).

rodenticides, in direct competition with FCA's "PESTLUR". Sales of "RAT LURE" have been nominal and are insignificant even when compared to sales of "PESTLUR".

"PESTLUR" was registered on the Principal Register of the Patent Office September 22, 1964. In October FCA sent a formal notice of infringement to Kemin. Kemin had registered its "LURE" mark with the State of Iowa in 1962, but had made no effort to register with the United States Patent Office until late 1964. Its application to register "LURE" on the Principal Register was denied because the mark was deemed merely descriptive of Kemin's goods. In February, 1966 Kemin registered "LURE" on the Supplemental Register, whereupon FCA petitioned to cancel that registration. The Trademark Trial and Appeal Board (TTAB) granted the petition and cancelled the "LURE" registration, and on May 6, 1971 the CCPA found "no error" in the TTAB decision, affirming the cancellation order. Kemin Industries, Inc. v. Flavor Corp. of America, 440 F.2d 1375, 58 CCPA 1180 (1971). FCA promptly filed this action in the Northern District of Illinois; venue was subsequently transferred to the Southern District of Iowa.

### I

The first question presented on this appeal is whether, in an infringement action, Kemin is collaterally estopped from challenging factual determinations of the CCPA in the earlier cancellation proceeding. In cancelling the "LURE" registration, the TTAB held that flavoring additives for animal feed were in the same channel of trade as flavoring additives for rodenticides because they were promoted through a common trade

publication and at least one company manufactured both products and would be a prospective purchaser of both products. The TTAB also held:

Insofar as the marks are concerned the phonetic equivalent of the word "LURE", comprising [Kemin's] mark, is the characterizing feature of [FCA's] marks "PESTLUR" and "RODENTLUR", and it is our opinion that this feature of similarity between the marks is such as would be reasonably likely to cause confusion or mistake or to deceive.

Kemin appealed to the CCPA pursuant to 15 U.S.C. § 1071(a), thereby waiving its right to a de novo hearing in federal district court under 15 U.S.C. § 1071(b). The CCPA affirmed.

Judge Stuart held the doctrine of collateral estoppel was applicable to those factual questions actually decided by the CCPA, and hence Kemin was estopped from challenging the CCPA's holding that the marks were so confusingly similar as to cause a reasonable likelihood of confusion. 358 F.Supp. at 1121.

The doctrine of collateral estoppel is a corollary of the broader doctrine of res judicata. Restatement of Judgments, §§ 47, 48. The doctrines are premised on the well recognized principle that "public policy and the interest of litigants require that there be an end to litigation." Kithcart v. Metropolitan Life Ins. Co., 119 F.2d 497, 500 (8th Cir. 1941), cert. denied, 315 U.S. 808, 62 S.Ct. 793, 86 L. Ed. 1207 (1942). The Supreme Court has on numerous occasions defined and distinguished these doctrines.[3] In Southern Pacific R. R. Co. v. United States, 168 U.S. 1, 18 S.Ct. 18, 42 L.Ed. 355 (1897), the Court said:

The general principle announced in numerous cases is that a right, question or fact distinctly put in issue,

---

3. *See, e. g.,* Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L.Ed. 195 (1877); Southern Pacific R.R. Co. v. United States, 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897); Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 671, 64 S.Ct. 268, 88 L.Ed. 376 (1944); Commissioner of Internal Revenue

v. Sunnen, 333 U.S. 591, 597–598, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Lawlor v. National Screen Service Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); United States v. Utah Construction Co., 384 U.S. 394, 421–423, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified.

168 U.S. at 48–49, 18 S.Ct. at 27.

In Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), after discussing the effect of res judicata, the Court further explained collateral estoppel:

But where the second action between the same parties is upon a different cause or demand, the principle of *res judicata* is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' . . . Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment, or collateral estoppel.

333 U.S. at 597–598, 68 S.Ct. at 719.

The parties in the instant appeal agree that res judicata is inapplicable because an infringement action and a cancellation proceeding are different causes of action. Our inquiry is therefore limited to the applicability of the more narrow doctrine of collateral estoppel. Professor Moore states:

The essence of collateral estoppel by judgment is that some question or fact in dispute has been judicially and finally determined by a court of competent jurisdiction between the same parties or their privies. Thus the principle of such an estoppel may be stated as follows: Where there is a second action between parties, or their privies, who are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause, or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended. (footnotes omitted)

1B J. Moore & T. Currier, Moore's Federal Practice ¶ 0.441(2), at 3777 (2d ed. 1965).

The parties in this appeal are the same as those who appeared before the CCPA, it was within the CCPA's jurisdiction to determine whether "PESTLUR" and "LURE" were so similar as to create a likelihood of confusion and to refuse registration, and the CCPA judgment is final. Therefore, two questions remain in determining whether to apply collateral estoppel: (1) whether the factual issue of likelihood of confusion is the same in both actions and (2) whether the CCPA is a court of competent jurisdiction to bind the parties in a subsequent action.

## A. *Identity of Issues*

██ The legal issue in a cancellation proceeding is the right to register a mark. 15 U.S.C. § 1052(d) provides that a mark may not be registered if it:

. . . [c]onsists of or comprises a mark which so resembles a mark registered in the Patent Office or a mark or trade name previously used in the

United States by another and not abandoned, *as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive. . . .* (emphasis added)

A finding of likelihood of confusion in a cancellation proceeding requires cancellation of the registration; use of the mark is irrelevant. SCM Corp. v. Royal McBee Corp., 395 F.2d 1018, 55 CCPA 1179 (1968).

■ The issue in an infringement action is whether the *use* of the respective marks in commerce results in infringement. Under section 32 of the Lanham Act, infringement of a registered mark results when an unregistered mark, as used in commerce, is "likely to cause confusion, or to cause mistake, or to deceive." [4] *See* Sleeper Lounge Co. v. Bell Manufacturing Co., 253 F.2d 720 (9th Cir. 1958).

■ Whether the marks, as applied to their respective products, are likely to cause confusion must be determined in both proceedings. Since the fact of likelihood of confusion is singularly determinative in a cancellation proceeding and that fact is likewise one of the essential elements in an infringement action, the identity of issue requirement is met.[5]

### B. *Court of Competent Jurisdiction*

There is and can be no dispute that the CCPA is a court of competent jurisdiction to determine likelihood of confusion in a cancellation proceeding. The question is whether factual findings should be binding on the parties in a cause of action over which it could not have jurisdiction.

In John Morrell & Co. v. Doyle, 97 F. 2d 232 (7th Cir.), cert. denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415 (1938), the court held that CCPA determinations were not entitled to collateral estoppel effect in subsequent infringement actions because the CCPA was not an Article III court. When *Morrell* was decided in 1938, the CCPA was merely an administrative arm of the Patent Office. Postum Cereal Co. v. California Fig Nut Co., 272 U.S. 693, 47 S.Ct. 284, 71 L.Ed. 478 (1927). Subsequently, however, in 1948, Congress enacted 28 U.S.C. § 1256, permitting certiorari review by the Supreme Court of decisions of the CCPA. In 1958, Congress made the CCPA an Article III court, 28 U.S.C. § 211. Finally, in Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 619 (1967), the Supreme Court reviewed the status of the CCPA and declared their decisions "final and binding in the usual sense." 383 U.S. at 526, 86 S.Ct. at 1037. *Postum* was declared to have "no vitality in the present setting." 383 U.

---

4. 15 U.S.C. § 1114(1)(a) provides:
    (1) Any person who shall, without the consent of the registrant—
      (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake, or to deceive;*

    \*     \*     \*     \*     \*

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

5. Kemin has argued that under Judge Learned Hand's analysis in The Evergreens v. Nunan, 141 F.2d 927 (2d Cir. 1944), cert. denied, 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed.

579 (1945), likelihood of confusion is not an "ultimate fact" in an infringement action and therefore collateral estoppel should not apply. To the contrary, we agree with Judge Stuart's conclusion that likelihood of confusion is an "ultimate fact" under the definition given it by Judge Hand—*i. e.*, a factual conclusion essential to the result. 358 F.Supp. at 1121. Kemin also argues that the mark considered by the TTAB and CCPA is not the same as the marks actually used in commerce because of the animal name prefixes. Judge Stuart found that the TTAB had before it and fully considered all the animal names, themselves unregistrable, which were used by Kemin in connection with its "LURE" mark. This finding is supported by the record, and Kemin is not entitled to a de novo mark by mark determination.

S. at 527, 86 S.Ct. at 1038. The rationale for *Morrell* expired with *Postum*.

█ We therefore hold that where the CCPA has found a likelihood of confusion between two similar marks in a cancellation proceeding, that fact is precluded from relitigation in a subsequent infringement action between the same parties under the doctrine of collateral estoppel.[6]

## II

The trial court held "PESTLUR" was a descriptive mark registered under 15 U.S.C. § 1052(f).[7] FCA claims this finding was clearly erroneous because "PESTLUR" is a fanciful mark entitled to incontestable status under the Lanham Act.[8] If "PESTLUR" is descriptive, FCA is only entitled to injunctive relief in those market areas where the mark has established a secondary meaning, either before or after registration.

6. *Accord:* Libbey-Owens-Ford Glass Co. v. Shatterproof Glass Corp., 165 USPQ 335 (E.D.Mich.1970).

7. 15 U.S.C. § 1052(f) provides:
   (f) Except as expressly excluded in paragraphs (a)–(d) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration.

8. The precise effect incontestable status might have on the scope of injunctive relief is not certain. *Compare* Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co., 477 F.2d 150 (6th Cir. 1973) and Burger King of Florida, Inc. v. Hoots, 403 F.2d 904 (7th Cir. 1968) *with* Tillamook County Creamery Assoc. v. Tillamook Cheese and Dairy Assoc., 345 F.2d 158 (9th Cir. 1965) and John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314 (7th Cir. 1961). Since we find the trial court's determination that "PESTLUR" is a descriptive mark not to be clearly erroneous, it is unnecessary to decide that question.

9. 15 U.S.C. § 1052(e) provides:

Section 1052, 15 U.S.C., permits registration of any mark except those expressly excluded. Those excluded include marks that are merely descriptive of the goods, 15 U.S.C. § 1052(e).[9] Part (f), however, permits registration of a mark otherwise excluded under (e) when the mark "has become distinctive of the applicant's goods in commerce." The section further provides:

The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration.

█ A mark on the Principal Register becomes incontestable five years after registration when the requirements of 15 U.S.C. § 1065 have been satisfied.[10]

No trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—
   *       *       *       *       *
(e) Consists of a mark which, (1) when applied to the goods of the applicant is merely descriptive or deceptively misdescriptive of them, or (2) when applied to the goods of the applicant is primarily geographically descriptive or deceptively misdescriptive of them, except as indications of regional origin may be registrable under section 1054 of this title, or (3) is primarily merely a surname.

10. 15 U.S.C. § 1065 provides in part:
   Except on a ground for which application to cancel may be filed at any time under subsections (c) and (e) of section 1064 of this title, and except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable: *Provided*, That—

An incontestable mark establishes "conclusive evidence of the registrant's right to use the registered mark in commerce," 15 U.S.C. § 1115(b), rather than merely prima facie evidence as provided for in 15 U.S.C. § 1115(a). However, "no incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise." 15 U.S.C. § 1065(4). Thus a descriptive mark which has been registered on the Principal Register because of its distinctive quality under § 1052(f) cannot become incontestable.

■ A distinctive mark is one which has acquired a secondary meaning. John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314 (7th Cir. 1961); McCormick & Co. v. Summers, 354 F.2d 668, 53 CCPA 851 (1966); Jenkins Publishing Co. v. Metalworking Publishing Co., 315 F.2d 955, 50 CCPA 1218 (1963); cf. Roselux Chemical Co. v. Parsons Ammonia Co., 299 F.2d 855, 49 CCPA 931 (1962). Secondary meaning is a common law concept and the protection afforded a distinctive mark under the Lanham Act is substantially identical to that provided by the common law.[11] Tillamook County Creamery Assoc. v. Tillamook Cheese and Dairy Assoc., 345 F.2d 158 (9th Cir. 1965); Schwinn Bicycle Co. v. Murray Ohio Mfg. Co., 339 F.Supp. 973 (M.D.Tenn.1971), aff'd per curiam, 470 F.2d 975 (6th Cir. 1972). At common law, a trademark was only entitled to injunctive protection in those market areas in which the mark had acquired a secondary meaning. See Sweetarts v. Sunline, Inc., 436 F.2d 705 (8th Cir. 1971). Thus, if "PESTLUR" is descriptive, infringement exists and injunctive relief is appropriate *only* where the mark has acquired a secondary meaning.

■■ The trial court did not explain why it found "PESTLUR" descriptive under 15 U.S.C. § 1052(f). Neither the application for registration nor the certificate of registration indicates whether "PESTLUR" was registered as a fanciful mark or as a descriptive mark permitted under § 1052(f). However, several factors in addition to the patently descriptive nature of the term itself demonstrate that this finding was not clearly erroneous:

(1) The affidavit accompanying the application asserts continuous use of the mark for eight years prior to registration. Since the Commissioner may base a finding of distinctiveness on evidence of five years continuous use in commerce, the requirements of § 1052(f) were or could have been satisfied by the affidavit.

(2) When Kemin sought to register "LURE" on the Principal Register in late 1964, registration was refused because the examiner found "LURE" to be merely descriptive of Kemin's goods. The opinion of Examiner Paul P. Gralnick dated March 9, 1965 states:

Applicant has claimed that its product acts as an agent to make the animal feed more palatable. Applicant has also claimed that "animal feeds commonly have unpleasant tastes and unpleasant odors which the animals find offensive" and that its "goods serve to either indicate [sic] these unpleasant tastes and odors or to overcome them with a more desirable taste or odor."

---

* * * * *

(4) no incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise.

11. A notable exception is the Lanham Act's elimination of the good faith adoption defense. 15 U.S.C. § 1072 makes registration on the Principal Register constructive notice of the registrant's claim of ownership. This exception has no significance in the instant case, however, since at the very latest Kemin had actual notice within a month after the registration of "PESTLUR". The effect is that in those state market areas not covered by the injunction FCA will be entitled to exclusive use of "PESTLUR" anytime it acquires a secondary meaning, regardless of whether Kemin's "LURE" mark has previously acquired a secondary meaning.

These claims clearly support the view that applicant's product will lure or tempt the animals to eat the feed to which the product has been added. As such, the mark sought to be registered is merely descriptive of applicant's goods.

This refusal to register is made Final.[12]

The examiner's analysis of "LURE" is applicable to "PESTLUR".

(3) The TTAB found that the phonetic equivalent of "LURE" was the dominating characteristic of the mark "PESTLUR". "Pest" is no less a descriptive term than "cattle" or "pig" or "dog", etc. The clever misspelling of a descriptive word does not eliminate its descriptive character, and combining two descriptive words to form one new word does not automatically render the new term fanciful.[13]

We hold that the trial court's finding that "PESTLUR" is a descriptive mark registered under § 1052(f) was not clearly erroneous.

### III

Both parties have raised a substantial number of other issues. We have carefully considered the arguments and the record, and conclude that Judge Stuart's findings of fact are not clearly erroneous and that the law was correctly applied in each instance.[14] The nature and scope of relief has been vigorously challenged by both parties and requires some comment.

The trial court found that Kemin's "LURE" had acquired a secondary meaning in ten states prior to the registration of "PESTLUR"; that "PESTLUR" had acquired a secondary meaning in Georgia and Florida; and that the Lanham Act controlled in the remaining 38 states. The Lanham Act forecloses the possibility of "LURE" acquiring superior trademark rights over "PESTLUR" in those 38 states. 15 U.S.C. § 1072. As to them, the trial court also held:

[T]he Court finds sales of "PEST-LUR" have been so minimal, sporadic and declining in the states where it has been sold, that it has in fact not acquired a secondary meaning in any of these states and there has not been sufficient penetration into the market of any one to entitle plaintiff to the protection of injunctive relief.

358 F.Supp. at 1125.

---

12. "LURE" had been used for only two years at that time and therefore could not qualify for the benefits of § 1052(f).

13. *See* 3 R. Callmann, The Law of Unfair Competition, Trade-Marks and Monopolies § 71.1(d), at 143–47 (3d ed. 1969) and cases collected therein.

14. The parties have argued that a considerable amount of bad faith, falsification and fraud has been practiced by each against the other with regard to these marks and their registration. The record amply supports Judge Stuart's conclusion that "neither party has conducted itself in an exemplary manner," and also supports his conclusion that each party's claims based on the misbehavior of the other are without merit. Principal among these is FCA's claim that Kemin did not adopt the "LURE" mark in good faith without prior knowledge of "PESTLUR". It is true that Rolland Nelson was a salesman for FCA when it was using "PEST-LUR" and Judge Stuart was singularly unimpressed with his testimony, but his conclusion that "LURE" was adopted in good faith was based on independent evidence, including the testimony of Nelson's successor as sales manager at FCA that he was never aware of "PESTLUR", and that conclusion is not clearly erroneous.

FCA also challenges the trial court's use of a chart showing the comparative sales of "PESTLUR" and Kemin's "LURE" products in determining market penetration and the existence of secondary meaning. These were the marks in issue and the total sales of the products bearing these marks constitute the appropriate basis for deciding these questions. Finally, FCA argues that the trial court misinterpreted its own injunction order by not holding Kemin in contempt for displaying "LURE" advertisements at a national industry trade show in Kansas City, Missouri. This argument is frivolous. The trial court has considerable discretion in construing its own orders and, in any event, the activity in Kansas City was clearly outside the scope of the order.

Thus, under the order, Kemin is entitled to sell its "LURE" products in the Lanham Act states unless and until FCA's "PESTLUR" acquires a secondary meaning therein.[15]

[redacted] FCA argues that it is entitled to nationwide injunctive protection because of its "advertising" program and Kemin claims that FCA is entitled to none at all. FCA has from time to time mailed price lists and advertising circulars listing "PESTLUR" to potential customers throughout the nation. It now asserts that "PESTLUR" has acquired a secondary meaning nationally, notwithstanding the absence of sales within a given market area, because of this "advertising" activity. We find no authority to support this proposition and it is contrary to the common law concept that trademark rights are acquired only by actual use of a mark in commerce in connection with the goods. *See* Electronic Communications Inc. v. Electronic Components for Industry Co., 443 F.2d 487, 492 (8th Cir. 1971).

[redacted] FCA relies on Agway Inc. v. Utah Cooperative Assoc., 170 U.S.P.Q. 298 (TTAB 1971), but that case is inapposite here. In that case, Utah, the holder of an incontestable mark, had started advertising in the disputed market area prior to actual entry, but before Agway began its use there. The Trademark Trial and Appeal Board said:

> Considering the entire record, there is no doubt but that Agway was the first to use its mark in each of the states claimed in its application for concurrent use. On the other hand, the record shows that Utah was advertising its mark in this same area at the time Agway began its use therein. Moreover, at approximately the same time, Utah was involved in plans to expand the use of its mark on a nationwide basis and began carrying out these plans soon thereafter (New York to California). In our view, Utah has established that at the time Agway began use of its mark in its trading area, it could reasonably be expected that Utah would expand its business into that same area. . . . It has subsequently done so. Moreover, by its advertising and promotional efforts, its good will in "TOTAL" may well have preceded its actual use on the eastern coast of the United States.
>
> 170 U.S.P.Q. at 300.

We are not here concerned with an incontestable mark. We agree that advertising is an appropriate factor to consider in determining whether a mark has acquired secondary meaning, but advertising alone is not sufficient to satisfy the significant market penetration test of Sweetarts v. Sunline, Inc., 380 F.2d 923 (8th Cir. 1967) and 436 F.2d 705 (8th Cir. 1971), especially where, as here, the advertising consists primarily of price lists mailed sporadically to potential customers. The trial court properly considered the advertising factor and its conclusion that "PESTLUR" had not acquired a secondary meaning in the 38 states controlled by the Lanham Act is not clearly erroneous. Kemin, on the other hand, must accommodate its own advertising program to the District Court's injunction, in order to avoid further infringement in Florida and Georgia. Modern marketing techniques permit such accommodation in most instances; in others Kemin must suffer the burden resulting from its infringement.

[redacted] Kemin's argument that its nominal sales of "LURE" in Georgia and Florida prior to the registration of "PESTLUR" should foreclose FCA from injunctive relief in those states is likewise without merit. As we noted in Part II above, no trademark rights accrue to a descriptive term unless that term has acquired a secondary meaning. In Sweetarts v. Sunline, Inc., *supra*, this

15. Nothing in the record suggests that the rodenticide portion of the animal feed market is substantial enough in any of the Lanham Act states to enable "PESTLUR" to acquire a secondary meaning in the immediate future.

court adopted a *de minimus* rule in determining whether a common law trademark was entitled to injunctive protection in a given market area. We there held that a significant penetration into a market must be shown before injunctive relief will be granted, and nominal or *de minimus* sales are not sufficient to justify that protection.

Affirmed.