**MILLER BREWING COMPANY, Plaintiff,**

v.

**G. HEILEMAN BREWING CO., INC., Defendant.**

**No. 76–C–584.**

United States District Court, W. D. Wisconsin.

Jan. 21, 1977.

---

John D. Winner, Winner, McCallum & Hendee, Madison, Wis., Anthony Fletcher, Conboy, Hewitt, O'Brien & Boardman, New York City, Allen W. Leiser, Quarles & Brady, Milwaukee, Wis., for plaintiff.

James Van Santen, Hill, Gross, Simpson, Van Santen, Steadman, Chiara & Simpson, Chicago, Ill., Steven E. Keane and John S. Skilton, Foley & Lardner, Milwaukee, Wis., for defendant.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is an action for trademark infringement, false designation of origin, and unfair competition by plaintiff (Miller). Miller seeks a preliminary injunction to prevent defendant's (Heileman's) continued sale, advertising, and distribution of beer under a brand name incorporating the word "LIGHT," the word "LITE," or any colorable imitation of either word. For the purposes of this motion only, I make the findings of fact set forth hereinafter under the heading "Facts."

Jurisdiction exists for the trademark infringement cause of action under 15 U.S. C.A. § 1121 (1974) and 28 U.S.C.A. § 1338(a) (1976).

### Facts

Miller and Heileman are brewers and sellers of beer. Miller distributes its beer nationally; Heileman, in several regions. As of the end of 1975, Miller was the nation's fourth largest brewer, selling 12.8 million barrels of beer in 1975; Heileman was seventh, selling 4.5 million barrels of beer.

About May 1967, Meister Brau, Inc. (Meister Brau), a Chicago brewer, began brewing and selling a reduced calorie beer which it sold under the trademark (MEISTER BRAU) LITE.

In November 1968, Meister Brau applied to register LITE as a trademark for beer on the principal register in the United States Patent Office. The Patent Office initially refused registration under 15 U.S.C. § 1052(e) on the ground that LITE was "merely descriptive" and might cause confusion with similarly registered trademarks of other non-beer products. Meister Brau overcame this objection by demonstrating to the satisfaction of the Patent Office that the mark had acquired a "distinctiveness" in the commerce of beer and thus was entitled to registration under id. § 1052(f). The evidence supporting this finding of distinctiveness consisted of affidavits by Meister Brau executives showing sales of over 60 million bottles and cans of this brand of beer, extensive advertising of the brand on television and in the print media, and letters from five competing beer producers recognizing LITE as a distinct brand name cultivated by Meister Brau.[1]

On the basis of Meister Brau's showing, the Patent Office approved three registrations on the principal register for beer with no available carbohydrates.

| Reg. No. | Date | Trademark |
|----------|------|-----------|
| 905,236 | Dec. 29, 1970 | LITE label (Color blue) |
| 929,276 | Feb. 15, 1972 | Meister Brau Lite design (color blue) |
| 929,277 | Feb. 15, 1972 | LITE design (no color)[2] |

Meister Brau continued producing and marketing LITE beer during the time these trademark registrations were pending, changing the labeling by 1971 to eliminate the Meister Brau designation above LITE. In 1970 and 1971, Meister Brau sold over 75,000 and 65,000 barrels of LITE, respectively.

Facing bankruptcy in 1972, Meister Brau sold several of its recipes, trademarks and other indicia of good will to Miller. Included in the sale was the assignment of Meister Brau's entire interest in its LITE trademarks and the registrations thereof, and the good will. Miller continued the brand in the core of the Meister Brau marketing

---

1. The five companies were P. Ballantine & Sons, Falstaff Brewing Corporation, Pabst Brewing Company, Jos. Schlitz Brewing Company, and the Stroh Brewing Company.

2. Amended by Miller on June 3, 1975.

area, with its and Meister Brau's (earlier) sales exceeding 55,000 barrels in 1972, and Miller's sales exceeding 50,000 barrels in 1973 and 40,000 barrels in 1974.

Concurrently, Miller re-examined the LITE brand and its marketing, concluding a broader market might exist if several aspects of the brand could be improved. First was taste; Miller believed it could improve the taste quality of LITE, and after a year or more of experimentation, adopted a modified recipe for LITE. Second was packaging; a revised more vigorous label was designed. Third was advertising; a new, straightforward, "more masculinely" oriented campaign was developed.

Miller tested its revised recipe, packaging and advertising approach, found them successful, expanded its marketing of LITE (replacing the former packaging with the new in the old Meister Brau marketing areas in 1974) and by early 1975 was distributing the brand nationally. The label Miller adopted had the word "LITE" in the most prominent position, the words "A Fine Pilsner Beer" in a somewhat less prominent position, and the Miller name in relatively very small letters.

Miller introduced the revised LITE in four markets in July of 1973, selling over 50,000 barrels (and spending over $500,000 advertising the brand). More than a dozen more markets were added during 1974; sales exceeded 400,000 barrels, advertising expenses, $4,000,000. With national distribution and advertising in 1975, sales exceeded two and one-half million barrels, advertising expenses, $10,000,000. In 1976, more than four million barrels were expected to be sold with more than $12,000,000 to be spent on advertising.

The effect of this advertising has been that between December, 1975 and March, 1976, a substantial percentage of beer drinkers perceived LITE (43%), Miller LITE (11%), or LITE from or by Miller (1%) as a distinct brand name indicative of a low-calorie or less-filling beer.[3]

In August, 1975, The Peter Hand Brewing Company, a small brewery in Chicago, launched a reduced calorie beer under a label which included the words: "Peter Hand"; "A Special Pilsner extra Light Beer"; "Smoother Less-Filling." The word "Light" was by far the most prominent word on the label, much more prominent than the Peter Hand designation. An overwhelming majority[4] of beer-drinking consumers who were allowed to view three different cans of beer—including Peter Hand (extra) Light—for 15 seconds each, identified the Peter Hand product as "LIGHT" or "LITE" and not as a Peter Hand product when asked to identify the beers which they had just seen but were no longer in view. Suit has been brought by Miller against Peter Hand for trademark infringement and is pending in the United States District Court for the Northern District of Illinois.

In November, 1975, the Jos. Schlitz Brewing Company, the nation's second largest brewer, launched a reduced calorie beer bearing a generally yellow label that displayed the word "Light" in by far the most prominent position. The words "Schlitz," "Beer," and "Special Lager" were in the proximity of the word "Light" but were considerably less prominent. There have been numerous examples of actual confusion on the part of consumers between "LITE" and (Schlitz) "Light." Suit was brought by Miller against Schlitz and is pending in the United States District Court for the Eastern District of Wisconsin.

Now, Heileman has introduced a reduced calorie beer in five scattered test markets

3. The percentages are based upon the results of a survey, the validity of which I accept in these findings. However, of course, I find that the percentages are approximations of consumer perceptions.

4. The survey upon which this statement is based employed the methodology of intercepting and interviewing 284 beer drinkers in two shopping malls in the Chicago metropolitan area. Since the sample upon which this survey is based was somewhat narrowly drawn, the results could be used for determining the existence of attitudes although not for quantifying them.

bearing a label (Exhibit E to the complaint herein) which also prominently displays the word "LIGHT." While this word appears on the "House of Heileman" seal and the word "Heileman" appears three times in the immediate vicinity of the word "LIGHT," the word "LIGHT" is by far the most prominent and eye-catching word on the label. Heileman has expended considerable resources in preparation for the introduction of its low-calorie beer under the "LIGHT" label:

```
Production Costs

    Cases produced through November 11, 1976    $113,007.00
    Beer in tanks                                   8,405.00

Manufacturing Supplies in Inventory as of November 11, 1976

    Cans                                           29,352.00
    Can Trays                                       1,157.00

Tray Die Changes                                      404.00

Can Die Changes                                       400.00

Media Advertising

    Television production                          18,500.00
    Print production                                3,500.00
    Purchase of television time                   114,938.00
    Purchase of print space                        23,932.00

Point of Sale Advertising

    Embossagraph Company                          100,558.00
    Inland Printing Company                         9,710.00
                                               _____

                    Total                        $423,863.00
```

Heileman has been engaged for some time, and intends to continue to engage, in the production and sale of other brands of beer, notably "Old Style" and "Special Export." Unless enjoined, Heileman will proceed to market its "Light" beer under its mark in competition with Miller's "LITE."

The respective beers of plaintiff and defendant which bear the trademarks in dispute are similar products, and the parties will be attempting to sell them to the same consuming public through the same general channels of distribution, employing the same general means and media for advertising and promotion. Beer is a relatively inexpensive commodity (as compared with automobiles, clothing, or household furnishings and appliances, for example) and expenditures for it are likely to be made by consumers with less care than expenditures for more expensive items. Although prior to purchase, purchasers of packages of beer in retail stores may see the rival beers in their respective containers, side by side or in close proximity, this will often not be true. It will seldom be true of purchasers of single glasses, bottles, or cans of beer in taverns, restaurants, and night clubs, where orders are placed orally by the customers to the bartenders or waiters. That "LITE" and "LIGHT" are phonetically identical means, of course, that they cannot be distinguished in conversation among members of the public, in radio advertising, or in oral

communication between customers and waiters or bartenders.[5]

## OPINION

■ In order to succeed in its motion for a preliminary injunction, plaintiff must demonstrate: (I) that it will probably succeed on the merits; (II) that there is a significant threat of irreparable harm to the plaintiff if the injunction is not granted; (III) that the balance of harms to the defendant and plaintiff if an injunction is or is not issued favors issuance; and (IV) that the public interest will not be disserved by issuance of the injunction. See generally *Doeskin Products v. United Paper Co.*, 195 F.2d 356, 358–59 (7th Cir. 1952); *Selchow & Righter Co. v. Western Printing & L. Co.*, 112 F.2d 430, 431–32 (7th Cir. 1940).

### I. The Probability or Improbability that Plaintiff Will Succeed on the Merits

■ In order for plaintiff ultimately to prevail on its trademark infringement cause of action it must show both that it has a right to the exclusive use of the trademark and that the defendant's use infringes upon that right.

### A. Plaintiff's right or lack thereof to the exclusive use of the trademark

A trademark is defined as:

. . . any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others.

15 U.S.C.A. § 1127 (1976).

■ The registration of trademarks is governed by certain statutory provisions, especially 15 U.S.C.A. §§ 1051, 1052 (1976).[6] The purpose of this registration scheme is not to create a trademark right but simply to provide for trademark publication, *Nashville Syrup Co. v. Coca Cola Co.*, 215 F. 527, 529 (6th Cir. 1914), and to allocate burdens of proof in the trial of an action for infringement.

■ The fact of Meister Brau's (Miller's assignor[7]) registration[8] of the marks will be admissible in evidence at trial and "shall be prima facie evidence of registrant's exclusive right to use the registered mark in commerce on the goods . . . specified in the registration . . . ." *Id.* § 1115(a).[9] Upon showing at trial Meister

5. The findings in this paragraph are made by the exercise of judicial notice of matters of common knowledge.

6. The owner of a trademark may register his trademark with the United States Patent Office upon a minimal showing of first-use in commerce. 15 U.S.C.A. § 1051 (1976). No trademark shall be refused registration on the principal register on account of its nature except when certain fairly specific conditions are met. *Id.* § 1052.

7. The assignment of the trademarks by Meister Brau to Miller is valid given that Meister Brau assigned its entire interest in the mark and the goodwill. See *E. F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d 512, 518–19, 521–22 (6th Cir. 1943), *cert. denied*, 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060 (1944).

8. Leaving aside the question of descriptiveness and secondary meaning, there is no indication in the record that the trademark was not registered according to proper procedures. However, Heileman alleges that the registration of plaintiff's mark is invalid because it infringes the previously registered Storz trademark:

"America's Light Refreshing Beer." But since this trademark uses "Light" descriptively and in combination with other words, it is not in conflict with plaintiff's mark. See generally *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 611 (7th Cir. 1965); *Nashville Syrup Co. v. Coca Cola*, 215 F. 527, 530 (6th Cir. 1914).

9. Plaintiff does not argue that the mark has obtained incontestable status under 15 U.S.C.A. § 1065. Such status would limit the alleged infringer to a few defenses explicitly outlined in 15 U.S.C.A. § 1115(b) (1974). In particular, if Miller's "LITE" mark had achieved incontestable status, Heileman would be foreclosed from arguing that Miller did not have exclusive rights to the mark because the mark was merely descriptive. *Id.* There is some question whether a trademark which has been found to be merely descriptive but to have acquired distinctiveness can ever acquire incontestable status. Compare *Flavor Corporation of America v. Kemin Industries, Inc.*, 493 F.2d 275, 281–82 (8th Cir. 1974), with *Union Carbide v. Ever-Ready, Inc.*, 531 F.2d 366, 375–76 (7th Cir. 1976). However, because the par-

Brau's registration and the assignment to it, Miller will be entitled to the presumption that the registration is valid, that Miller is the owner of the mark, and that Miller has exclusive right to use the mark in commerce under the specified conditions and limitations of the registration, but Heileman is free to challenge on its merits Miller's right to the exclusive use of the "LITE" trademark. *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 378 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

1. The Merits of Miller's "LITE" Trademark Claim: Descriptiveness

■ Given that Miller almost certainly will be entitled to the above-mentioned presumption at trial, the defendant will have the burden of going forward and proving that the trademark is defective in some manner. Defendant contends that Miller's trademark is defective because it is merely descriptive. If this contention is sound (and unless, as will be discussed below, Miller can then show that the mark has acquired a secondary meaning), Miller's action for trademark infringement will be defeated. *Union Carbide Corp. v. Ever-Ready, Inc., supra*, at 378. I am not called upon to resolve definitely the question as to whether "LITE" is merely descriptive; only whether Heileman is likely to be successful at trial in showing that it is. On the evidence before me, there is a strong likelihood that Heileman will be unable to prove at trial that Miller's mark is merely descriptive.

■ The case law appears to recognize a continuum of types of trademarks falling into three categories: the merely descriptive, the suggestive, and the purely fanciful or arbitrary. *Union Carbide Corp. v. Ever-Ready, Inc., supra*, at 378–79. Marks in the latter two categories are subject to the exclusive appropriation of a producer, whereas marks in the former category are not. It could hardly be said that "LITE" is a purely fanciful or arbitrary name for a

low-calorie, less-filling beer product at least in the same way that "The American Girl" is a purely fanciful or arbitrary name when applied to women's shoes. See *Hamilton Shoe Co. v. Wolf Brothers*, 240 U.S. 251, 256–57, 36 S.Ct. 269, 60 L.Ed. 629 (1916). Thus, the important question is whether "LITE" actually describes the ingredients, qualities, or characteristics of the beer or merely suggests the existence of some attribute or effect of the beer.

The line between descriptive and suggestive marks is not vivid. The court of appeals for this circuit has quoted approvingly the distinction between these two terms stated by A. Seidel, S. Dalroff, and E. Gonda, Trademark Law and Practice, § 4.06 at 77 (1963):

> Generally speaking, if the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive.

*Union Carbide Corporation v. Ever-Ready, Inc., supra*, at 379.

The court of appeals for this circuit has indicated, although not held, that "Holeproof" as applied to stockings and "EVEREADY" as applied to batteries are not descriptive but rather suggestive terms. See *Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc.*, 205 F.2d 921 (7th Cir. 1953), *cert. denied*, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953), *citing Holeproof Hosiery Co. v. Wallach Bros.*, 172 F. 859 (2d Cir. 1909); *Union Carbide Corp. v. Ever-Ready, Inc., supra*, at 379. See also *General Shoe Corp. v. Rosen*, 111 F.2d 95, 98–99 (4th Cir. 1940) ("Friendly" as applied to shoes is suggestive of shoes which are friendly to the feet). Both "Holeproof" and "EVEREADY" seem to impart some information about the products to which they are appended, but to impart it indirectly, and to require some operation of the imagination to connect the terms to the products.

Likewise, the mark "LITE" does not describe a beer which is light in weight or

ties did not address this question in their briefs, I make no determination of the likelihood that

the trademark has achieved incontestable status.

color, but rather connotes one which is lower in calories or less-filling than regular beer.[10] It requires some operation of the imagination to connect the term "LITE" with a beer which would cause its consumers to weigh less, all else being equal, than those who consume regular beer.

Thus, it appears unlikely that Heileman will meet its burden of showing that "LITE" is a descriptive term.[11]

2. The Merits of Miller's "LITE" Trademark claim: Secondary Meaning

■ In the event that Heileman does prove at trial that "LITE" as applied to beer is descriptive, Miller will be entitled to prevail, nevertheless, if it can show that the mark has acquired a secondary meaning in identifying the product of a particular producer. *Union Carbide Corp. v. Ever-Ready, Inc., supra,* at 380.[12] Although it would be necessary for Miller to show that consumers are aware that "LITE" beer comes from a single source, it need not show that consumers are aware of the actual name of that source. *Union Carbide Corp. v. Ever-Ready, Inc., supra,* at 380; *Spangler Candy Co. v. Crystal Pure Candy Co.,* 353 F.2d 641, 647 (7th Cir. 1965), citing *Shredded Wheat Co. v. Humphrey Cornell Co.,* 250 F. 960,

963 (2d Cir. 1918), modifying 244 F. 508 (D.C.Conn.1917).

■ Thus, whether "LITE" has acquired a secondary meaning is basically a factual question regarding consumer perceptions. *Carter-Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794, 802 (9th Cir. 1970). Clearly, the most direct evidence on this issue is consumer testimony and consumer surveys. Other evidence of some consequence, in order of importance, would be the volume of sales, the length and manner of use of the mark, and the amount and manner of advertising. *Union Carbide Corp. v. Ever-Ready, Inc., supra,* at 380–81.

Miller has provided fairly persuasive evidence in the form of a national consumer survey that a substantial percentage of consumers perceived LITE (43%), Miller LITE (11%), or LITE from or by Miller (1%) as the product of a particular producer, that is, as a distinct brand name indicative of a low-calorie or less-filling beer. The timing of this survey (December, 1975 to March, 1976) is particularly noteworthy since it came at a time when Peter Hand and Schlitz were just beginning to market their own low-calorie beers under "Light" trademarks but after Miller had marketed LITE nationally for one year (1975) and regionally for several years prior to 1975. At this

---

10. It is commonly known that "light" has been used widely and for many years in the beer industry to connote the quality of lightness in color or the quality of lightness in body, or both. Such use has undoubtedly been descriptive, rather than suggestive, of those qualities. It appears that Meister Brau was the first to use the word, in a corrupted form (LITE), to connote a third and distinct quality of its new brand of beer, namely, its low caloric content. It may well be unusual that a word which is well established as descriptive of two qualities of a beer is claimed to be merely suggestive of a third quality. But, as I have concluded, "LITE" is indeed no more than suggestive of this third quality. I can discern no basis in precedent, and none in public policy, to deny suggestiveness to a word which is no more than suggestive of one quality of a product simply because it is obviously descriptive of other qualities of the same product.

11. Defendant also argues that "LITE" is deceptively misdescriptive. However, there has been absolutely no showing as to how the public

would be misled as to the ingredients of "LITE" beer from the trademark. See *e. g., Nashville Syrup Co. v. Coca Cola Co.,* 215 F. 527, 531–32 (6th Cir. 1914).

12. The fact that Meister Brau (Miller) has already demonstrated to the Patent Office that "LITE" had acquired a certain distinctiveness does not entitle Miller to any procedural or substantive advantage on the issue of secondary meaning in the instant case—although there is some overlap in the type of evidence used to prove distinctiveness, on the one hand, and secondary meaning, on the other. Distinctiveness refers to the consumer popularity and acceptance of the mark whereas secondary meaning refers to consumer identification of a unique product from a single producer. *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.,* 350 F.Supp. 1341, 1359–60 (E.D.Pa.1972), aff'd, 480 F.2d 917 (3d Cir. 1973). But see *Flavor Corp. of America v. Kemin Industries, Inc.,* 493 F.2d 275, 282 (8th Cir. 1974).

time, the confounding effect, if any, on the survey results that might have accrued from the introduction of low-calorie beers under the "Light" trademarks by Schlitz and Peter Hand was just beginning. That such a significant percentage of consumers mentioned and correctly spelled "Lite" indicates that consumers were aware that "LITE" was a product, beer, which came from a particular, unique source, although in most cases that source was not identified. See *Union Carbide Corp. v. Ever-Ready, Inc., supra,* at 381.

Additionally, the rapidly increasing volume of Miller's "LITE" beer sales, the use of "LITE" as a trademark from 1967 to 1974 in several regions and in 1975 and 1976 nationally by Meister Brau and Miller, and the massive advertising by Miller of "LITE" beer as a low-calorie and less-filling beer, all suggest that Miller will be likely to prevail on the issue of secondary meaning even if "LITE" is determined to be descriptive.

In the following section of this opinion, I will discuss the question whether there is a likelihood of confusion between plaintiff's mark and defendant Heileman's mark. In this connection, plaintiff has offered evidence that there has already developed some confusion between plaintiff's mark and Schlitz's "Light" mark, and between plaintiff's mark and Peter Hand's "Light" mark. Defendant Heileman contends that if plaintiff's mark had acquired a secondary meaning, this secondary meaning had been dissipated, before defendant Heileman made its move, by the confusion emanating from the introduction of the Schlitz and Peter Hand "Light" beers in the market. This would be a troublesome point if in the record before me there were evidence not only of confusion, but that the confusion had already created a market situation in which Miller's "LITE" is no longer perceived by a substantial number of consumers as the product of a particular producer.

Whether the confusion between plaintiff's mark, on the one hand, and the respective marks of Schlitz and Peter Hand, on the other, whatever the nature and extent of the confusion may be, is the result of wrongdoing by Schlitz or Peter Hand, or both, is a question not before this court, but before two other coordinate federal district courts. Even if it were the result of wrongdoing on the part of both Schlitz and Peter Hand, it is uncertain whether plaintiff Miller would yet enjoy some protection against the later entry of defendant Heileman into a market situation in which plaintiff Miller's mark had lost its secondary meaning. However, the record in this case does not support even a provisional finding that the secondary meaning of plaintiff's mark, once existent, is no longer existent.[13]

B. The likelihood or lack thereof that Miller will be able to prove infringement of its right to the exclusive use of the "LITE" trademark

Section 32(1) of the Lanham Trade-Mark Act, 15 U.S.C. § 1114(1) prohibits the use in commerce, without the consent of the registrant, of

. . . any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1) (1963). Under the Lanham Act the test for infringement is the likelihood of confusion on the part of consumers. *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 611 (7th Cir. 1965). See also *Brown-Forman Distillery Co. v. Arthur M. Block L.I.,* 99 F.2d 708, 709–10 (7th Cir. 1938). Among the factors the court should take into consideration in determining the likelihood of confusion are:

13. Well after the present motion for a preliminary injunction had been submitted and was under advisement, and without leave of court having been sought, defendant submitted a series of assertions about yet more entrants into the lists of low-calorie beer competition. I give no effect to these recent submissions.

. . . the type of trademark in issue, the similarity of design, similarity of products, identity of retail outlets and purchasers, identity of advertising media utilized, defendant's intent, and actual confusion.

*Union Carbide Corp. v. Ever-Ready, Inc.,* supra, at 381–82. As I have found above, the two products are similar, sales of both will be attempted to the same buying public through the same general retail channels, and both parties will be employing the same general means and media for advertising and promotion.[14]

■ Under these circumstances, the degree of similarity of the marks needed to support a finding of infringement is less than in the case of dissimilar, non-competing products. *Stembridge Products, Inc. v. Gay,* 335 F.Supp. 863, 867 (M.D.Ga.1971). The Miller and Heileman trademarks are similar in overall design. The word "LITE" and "LIGHT" are visually highly similar and phonetically identical. This similarity of "LITE" and "LIGHT" is especially significant in determining the likelihood of confusion because these words constitute the dominant portion of each label and are likely to create a more lasting or prime impression on the public than the other words on the label. *Pikle-Rite Co. v. Chicago Pickle Co.,* 171 F.Supp. 671, 675–76 (N.D. Ill.1959).

■ While a visual inspection of the Miller and Heileman marks placed side-by-side reveals an extremely close resemblance, one can distinguish the Miller product from the Heileman product. However, such a side-by-side test is not the test for the likelihood of confusion. *Albert Dickinson Co. v. Mellos Peanut Co. of Illinois,* 179 F.2d 265, 270 (7th Cir. 1950). Consumers are likely to rely on vague impressions and recollections when choosing a product especially when the product is relatively low-priced and commands a small fraction of an average consumer's budget. Given the imprecision of consumer recollections in such

cases, the appropriate test is whether consumers with a rather indefinite recollection of the marks would be able to discriminate between the labels of the competing products or would tend to choose one product thinking it is the other, when only one brand is in sight. See e. g. *Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc.,* 205 F.2d 921, 925–26 (7th Cir. 1953).

■ I conclude that plaintiff will probably prevail ultimately in its contention that the similarity in the marks, and most particularly the strong emphasis on "Light" in the Heileman mark, make consumer confusion between the two products highly likely.

## II. Irreparability of Harm to Miller or Lack Thereof

It will be quite some time before this case can be resolved at trial. Apparently, cases pending in other courts brought by Miller against other brewers which may have a bearing on this case will not be decided for some time. In the absence of a preliminary injunction, Heileman will market its "LIGHT" beer in competition with Miller "LITE."

■ I have concluded above that plaintiff will probably prevail in its contention that confusion will occur between the two labels whether the purchase is made verbally or after a visual inspection of the product. Such confusing similarity has been held to be sufficient for a determination that irreparable harm will occur if an injunction is not entered. *P. Daussa v. Sutton Cosmetics (P.R.) Inc.,* 462 F.2d 134, 136 (2d Cir. 1972), citing *Sutton Cosmetics (P.R.) Inc. v. Lander Co., Inc.,* 455 F.2d 285, 288 (2d Cir. 1972). Conceivably, if Miller ultimately prevails in this action it will be entitled to money damages, measured perhaps by the profit Miller would have realized had all those who purchased Heileman's "Light" purchased Miller's "Lite" instead. But consumers whose initial experi-

---

**14.** The present record permits no findings of fact, and I have made none, as to whether Heileman intended to confuse the buying pub-

lic, or whether actual confusion has yet occurred as between the Miller and Heileman marks.

ence with a low-calorie beer is with Heileman's "Light" and is unfavorable, probably will not soon try "Lite." It is true that because of the confusion, "Lite" may benefit from follow-up purchases of low-calorie beer by those whose first encounter has been with Heileman's "Light" and has been favorable. However, the results of such difficulties in a highly volatile retail market for beer would not be easily reducible to money damages.

Miller could possibly alleviate this confusion and irreparable harm through an advertising campaign directed at distinguishing between the "LITE" and "LIGHT" marks. The cost of this advertising would be susceptible to recovery in money damages. However, it would probably be impossible to determine the effectiveness of such an advertising campaign, and also to determine the financial effects upon plaintiff's sales arising from the necessity to stress this defensive theme rather than an affirmative theme promoting "Lite."

I conclude that it is probable that unless the motion for a preliminary injunction is granted, Miller will suffer irreparable harm.

### III. The Balance of Equities

Heileman argues that the preliminary injunction will harm it in two ways: loss of reputation, and loss of the resources it has expended in the development of "LIGHT" beer.

Particularly in the absence of a judicial finding that it has deliberately sought to create confusion, I am unpersuaded that Heileman will suffer loss of reputation to any significant extent if enjoined temporarily from marketing beer under its "LIGHT" trademark. I consider it unlikely that an injunction so limited in scope and duration will affect Heileman's sales of its "Old Style," "Special Export," or other beer brands.

Second, Heileman has not demonstrated what fraction of the costs incurred in developing "LIGHT" beer would be lost as a result of the preliminary injunction. Clearly, some of these expenditures will not be

lost even if Heileman is forced to re-label its beer (e. g., manhours used in developing the beer formula). Other expenses (e. g., point-of-sale advertising expenses) will not have been wholly wasted if Heileman ultimately prevails on the merits. Thus, Heileman will lose only a part of its total expenditures to date on the "LIGHT" beer project. It probably will be possible to assign a monetary value to this lost fraction should Heileman prevail on the merits at trial.

Perhaps more significant than either of these two categories of harm is the postponement, during the pendency of this suit, of Heileman's opportunity to enter the low-calorie beer competition on a broad scale and under the particular banner it has chosen. The factors at play in such a market are unquestionably sophisticated and volatile, and I would not disparage the possible negative consequences for Heileman. But these potential negative consequences for a producer which is poised for the fray are less serious than would be an interruption in the activity of a producer already fully engaged.

I conclude that the probable harm to plaintiff Miller from the denial of the preliminary injunction outweighs the probable harm to defendant Heileman from its issuance.

### IV. The Effect of a Preliminary Injunction on the Public Interest

The preliminary injunction will tend to maintain the status quo in the market for low-calorie beer. There is no clear indication that preservation of that status quo will affect the public interest one way or another. If the effect of the preliminary injunction proves to be only a delay, pending a final decision in the lawsuit, in the introduction of Heileman's "Light" beer packaged within the intended label, the effect upon the public interest will have been minimal. If a permanent injunction is ultimately entered herein in plaintiff's favor, presumably the public interest will have been served by the earlier prohibition of the practice finally determined to be unlawful.

In this suit involving Miller's claim for injunctive protection of its "LITE" trademark, there is no occasion for this court to inquire into the public interest with respect to the production and sale of beer generally in the United States, or with respect to the relative competitive positions of these two parties in the beer market.

### Order

Upon the basis of the entire record, it is ordered that commencing on the 20th day following the entry of this order, and thereafter during the pendency of this action, defendant is enjoined from the continued sale, advertising, and distribution of beer anywhere in the United States, under the brand name incorporating the word "Light" in the manner of the label attached to the complaint herein as Exhibit E, and under any colorable imitation of the following labels and designs registered on the principal register of the United States Patent Office: No. 905,236 (December 29, 1970); No. 929,276 (February 15, 1972); and No. 929,277 (February 15, 1972, as amended June 3, 1975).