**TONKA CORPORATION, Plaintiff,**

v.

**ROSE ART INDUSTRIES, INC., Defendant.**

**Civ. A. No. 93-544 (AJL).**

United States District Court, D. New Jersey.

Oct. 4, 1993.

Carol F. Simkin, Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City and Frederic S. Kessler, Clapp & Eisenberg, P.C., Newark, NJ, for plaintiff.

Robert L. Epstein, James & Franklin, New York City, and Roslyn S. Harrison, McCarter & English, Newark, NJ, for defendant.

## OPINION

LECHNER, District Judge.

This is an action brought by plaintiff Tonka Corporation ("Tonka") alleging, *inter alia,* infringement by defendant Rose Art Industries, Inc. ("Rose Art") of Tonka's Federally-registered trademarks for the modeling compound popularly known as "PLAY–DOH" and its related accessories. Complaint (the "Complaint"), filed 5 February 1993, ¶ 1. Rose Art sells and has sold a modeling compound known in succession as "FUN-DOUGH" and "FUN DOUGH." Affidavit of Robert L. Epstein (the "Epstein Aff."), ¶ 2; Defendant's Local Rule 12G Statement of Material Facts in Opposition to Plaintiff's Rule 12 Motions If Treated as Motions for Summary Judgment (the "Rose Art 12G Statement"), ¶¶ 4–5. Jurisdiction is alleged pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121 and pursuant to 28 U.S.C. §§ 1331, 1332 and 1338(a) and (b). Complaint, ¶ 2.

Currently before the court is the motion of Tonka to dismiss the counterclaim of Rose Art pursuant to Fed.R.Civ.P. 12(b)(6) and to strike Rose Art's first, third and fourth affirmative defenses, pursuant to Fed.R.Civ.P. 12(f).[1] For the reasons that follow, the Tonka motion to dismiss the counterclaim of Rose Art is considered as a motion for summary judgment and, pursuant to Fed. R.Civ.P. 56, is denied. The Tonka motion to strike Rose Art's first, third and fourth affirmative defenses is granted in part and denied in part.

*Facts*

A. *Background*

Tonka is a Minnesota corporation with its principal place of business located in Pawtucket, Rhode Island. Complaint, ¶ 4. For many years, Tonka and its predecessors have engaged in the business of developing, manufacturing, distributing and selling toys and games. *Id.*, ¶ 6. Tonka is the maker of the modeling compound popularly known as "PLAY–DOH" and its related accessories.

*Id.*, ¶ 7–8; *see also Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, slip op., 2 (T.T.A.B. 20 March 1986) (hereinafter, *Kenner I* ).

PLAY–DOH is sold in toy stores, school stores, grocery stores, drug stores, department stores, hobby shops and other retail outlets. *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 351 (Fed.Cir.) (hereinafter, *Kenner II* ), *cert. denied,* —— U.S. ——, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992); *see also Kenner I*, slip op. at 4. PLAY–DOH products are also advertised on television, in women's magazines and in trade publications and are shown at toy fairs. *Kenner I*, slip·op. at 4. Since 1978, it is alleged sales of PLAY–DOH and PLAY–DOH accessories have exceeded $360,000,-000, while advertising and promotional expenditures for PLAY–DOH products have exceeded $15,800,000. Complaint, ¶ 8.

Since 1957 and continuously to date, Tonka and its predecessors have used and have been the registered holders of eight Federally-registered trademarks[2] for PLAY–DOH

1. In support of its motions, Tonka has submitted the following: Plaintiff's Memorandum of Law in Support of its Motion to Dismiss Defendant's Counterclaim and to Strike Defendant's First, Third, and Fourth Affirmative Defenses ("Moving Brief"); Plaintiff's Reply Memorandum of Law in Further Support of its Motion to Dismiss Defendant's Counterclaim and to Strike Defendant's First, Third, and Fourth Affirmative Defenses ("Reply Brief"); Plaintiff's Supplemental Memorandum of Law in Support of Motion to Dismiss Defendant's Counterclaim and to Strike Defendant's First, Third, and Fourth Affirmative Defenses ("Tonka Supp. Brief"); Affidavit of Laurence S. Rickles (the "Rickles Aff.").

In opposition to the Tonka motions, Rose Art has submitted the following: Defendant's Memorandum of Law in Opposition to Plaintiff's Rule 12 Motion to Strike ("Opp. Brief"); Defendant's Supplemental Brief in Opposition to Plaintiff's Motion Pursuant to Rules 12(f) and 12(b)(6) ("Rose Art Supp. Brief"); Affidavit of Norman S. Passman (the "Passman Aff."); Epstein Aff.; Rose Art 12G Statement.

Oral argument was heard on 28 June 1993; citations to the transcript will be as "Tr. at ——."

2. The eight Federally-registered trademarks for PLAY–DOH products are as follows:

(1) *PLAY–DOH:* Registration No. 650,035; Registration Date 13 August 1957; describing "plastic type modeling compound for children's use";

(2) *PLAY–DOH Modeling Compound and Design:* Registration No. 904,675; Registration

Date 22 December 1970; describing "modeling compound for children's use; children's toy kits comprising modeling compound and different types of apparatus to work with said modeling compound";

(3) *PLAY–DOH:* Registration No. 1,023,855; Registration Date 28 October 1975; describing "toys—namely, modeling compound and apparatus to work with said modeling compound sold as a unit and equipment for playing parlor-type amusement games";

(4) *PLAY–DOH and Design:* Registration No. 1,033,140; Registration Date 10 February 1976; describing same goods as Registration No. 1,023,855;

(5) *PLAY–DOH and Design:* Registration No. 1,221,942; Registration Date 28 December 1982; describing same goods as Registration Nos. 1,023,855 and 1,033,140.

(6) *PLAY–DOH FARM SET:* Registration No. 902,137; Registration Date 10 November 1970; describing "toys—namely, modeling compound and apparatus to work with said modeling compound sold as a unit";

(7) *PLAY–DOH STORY BOX:* Registration No. 1,015,364; Registration Date 8 July 1975; describing "toys—namely, modeling compound and apparatus to play with said modeling compound sold as a unit";

(8) *PLAY–DOH BAKE'N CAKE SHOP:* Registration No. 1,015,365; Registration Date 8 July 1975; describing same goods as Registration No. 1,015,364.

*See* Complaint, ¶ 11.

products.[3] *Id.*, ¶¶ 7–8, 11. These registrations are alleged to remain in full force and effect. *Id.*, ¶ 11. In addition, on 19 October 1992, Tonka filed an application, which remains pending, to register "PLAY–DOH and Design" to describe "modeling compound and apparatus to work with said modeling compound sold separately and as a unit." *Id.*

Rose Art is a New Jersey corporation with its principal place of business in Orange, New Jersey. Answer (the "Answer"), filed 2 March 1993, Counterclaim, ¶ 2. Rose Art sells children's arts and crafts supplies, including crayons, paints, chalkboards, stationary and the like. *Kenner II*, 963 F.2d at 351. Like Tonka, Rose Art sells its goods to discount and chain toy stores, supermarkets, hobby shops and schools. *Id.* at 352; *Kenner I*, slip op. at 6. Rose Art also promotes its products in catalogues and at trade shows, although it appears Rose Art does not engage in print or television advertising. *Kenner II*, 963 F.2d at 352; *Kenner I*, slip op. at 6.

In the mid–1980s, Rose Art decided to develop a water-based modeling compound. *Kenner II* 963 F.2d at 351. In January 1986, Rose Art adopted and began to use the mark "FUNDOUGH" in connection with this modeling compound. *Id.* at 351–32; *Kenner I*, slip op. at 5. In March 1986, Rose Art sought Federal registration of the FUNDOUGH trademark to describe "toys— namely, modeling compound and related accessories for use with modeling compound sold as a unit." Complaint, ¶ 14. The registration of FUNDOUGH was opposed by Kenner, Tonka's predecessor. *See Kenner I*, slip op. at 1–2. Commercial shipments of FUNDOUGH commenced in or about August 1987. Complaint, ¶ 12; Answer, ¶ 12; *Kenner I*, slip op. at 5. FUNDOUGH sales

rose from $50,000 on 1987 to $500,000 in 1988. *Kenner I*, slip op. at 6.

### B. *Kenner I: The Opposition Proceeding*

On 5 December 1986, Kenner filed a Notice of Opposition in the United States Patent and Trademark Office (the "Trademark Office") contesting Rose Art's application for registration of FUNDOUGH.[4] Complaint, ¶ 16. Kenner argued the FUNDOUGH trademark so resembled the PLAY–DOH trademark that, when applied to Rose Art's products, it was likely to cause confusion, to cause mistake or to deceive the public because "the public was likely to believe that FUNDOUGH products had their origin with [Kenner] and such goods were approved, endorsed or sponsored by [Kenner] or were associated in some way with [Kenner]." *Id.*, ¶ 16; *see also Kenner I*, slip op. at 2.

On 29 April 1991, after extensive discovery, the Trademark Trial and Appeal Board (the "TTAB") recognized PLAY–DOH was a famous trademark. The TTAB stated:

> At one time the most advertised product in the toy industry, the PLAY–DOH product is still well-known in the toy field and is a market leader with sixty to seventy percent of the modeling compound market. There is high unaided brand awareness of this toy.... Repeat purchases are common partially because the product is used up.

*Kenner I*, slip op. at 4 (citations omitted). The TTAB also determined that "there can be no question that, for our purposes, the goods of the parties must be considered substantially identical, and are sold in the same types of retail outlets." *Id.* at 7–8.

Nevertheless, the TTAB found that FUNDOUGH was "sufficiently different" from

---

3. The PLAY–DOH trademark was first used by Rainbow Crafts. *See Kenner I*, slip op. at 3. General Mills acquired the mark in 1965 when it bought Rainbow Crafts. *Id.* In 1967, General Mills also acquired Kenner Parker Toys Inc. ("Kenner") which, in 1971, assumed responsibility for the PLAY–DOH product line. *Id.*

4. Prior to filing a Notice of Opposition, Kenner notified Rose Art by letter that "it objected to [Rose Art's] registration, or any use of the FUNDOUGH trademark because it was confusingly

similar to the PLAY–DOH trademark for the identical goods." Complaint, ¶ 15; *see also* Answer, ¶ 15 (conceding receipt of letter). Kenner also requested Rose Art to withdraw its registration application and discontinue any use being made" of the FUNDOUGH mark. Complaint, ¶ 15. Kenner purported to put Rose Art "on notice" that, if it failed to abide by the above requests, "it was proceeding at its own risks." *Id.*

PLAY–DOUGH that "confusion is unlikely." *Id.* at 8. The TTAB explained:

> We base this conclusion in part upon the fact that the only common element in the marks is the *generic* element "DOUGH," or its phonetic equivalent "DOH" in the suffix of [Kenner's] mark. The record establishes that "dough" is a type of modelling compound which is water-based. . . . [Kenner] itself [has] used the term . . . generically.
>
> If the only common element in marks is a generic term, such similarity is generally insufficient to cause likelihood of confusion because the generic matter is not likely to be understood by the public as an indication of common affiliation or trade identity, but rather is likely to be viewed as indicative or characteristic of the products. Differences in the remaining parts of the marks are likely to avoid confusion in such cases.[5]

*Id.* at 8–9 (emphasis added). The TTAB concluded:

> Given this fact and the fact that consumers, presumably aware of the use of other marks containing this generic word or its phonetic equivalent, would look to the remaining portions in an effort to distinguish source, we believe that the sound and appearance of the respective marks are sufficiently dissimilar.

*Id.* at 9.

The TTAB also stated that the terms "fun" and "play" "are not usually interchanged in everyday speech and we believe their use in the respective marks will not be likely to cause confusion." *Id.* at 10. The TTAB further stated:

> In view of the renown of [Kenner's] mark, we believe few would pause to analyze any similarity in meaning of the prefixes "PLAY" and "FUN" in the marks. Rather, purchasers, viewing the marks in their entireties, are likely to immediately recognize the substantial differences.

*Id.* at 11.

The TTAB concluded that, having "considered the renown of [Kenner's] mark with respect to modeling compound," this fame did not require registration of FUNDOUGH be denied. The TTAB stated:

> The fame which [Kenner] claims for its mark has so familiarized the public with the PLAY–DOH name and logo that any deviation is immediately detected and perceived as different. . . . The differences are made more noticeable because of the extreme familiarity with PLAY–DOH: many adults purchasing the product hav[e] played with it as a child or purchased it repeatedly for their children. Such consumers are simply not likely to be confused because of their long term acquaintance with [Kenner's] mark.

*Id.* at 11–12. Accordingly, the TTAB dismissed the opposition to the trademark registration of FUNDOUGH. *Id.* at 13.

### C. Kenner II: The Federal Circuit Opinion

Kenner appealed the TTAB decision to the United States Court of Appeals for the Federal Circuit (the "Federal Circuit"). *See Kenner II*, 963 F.2d at 352. On 15 April 1992, finding that the TTAB "treated the fame of Kenner's mark as a liability and otherwise improperly weighed the factors showing confusing similarity," *id.* at 351, the Federal Circuit reversed the TTAB decision.

Discussing the thirteen factors set forth in *In re E.I. Du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A.1958) for determining likelihood of confusion, the Federal Circuit recognized that "the fifth *Du Pont* factor, fame of the prior mark, plays a dominant role in cases featuring a famous or strong mark." *Kenner II*, 963 F.2d at 352. On this point, the Federal Circuit recognized that "[f]amous or strong marks enjoy *a wide latitude of legal protection*." *Id.* (citing *Sure–Fit Prods. Co. v. Saltzson Drapery Co.*, 254 F.2d 158, 160 (C.C.P.A.1958)). The Federal Circuit explained:

> [A] mark with extensive public recognition and renown deserves and receives more

---

5. The TTAB noted that Kenner did not object to Rose Art's use of the word "dough" *per se* in its mark. *Kenner I,* slip op. at 9.

legal protection than an obscure or weak mark.

Achieving fame for a mark in a marketplace where countless symbols clamor for public attention often requires a very distinct mark, enormous advertising investment, and a product of lasting value. After earning fame, a mark benefits not only its owner, but the consumers who rely on the symbol to identify the source of a desired product....

[Nevertheless,] a mark's fame creates an incentive for competitors "to tread closely on the heels of [a] very successful trademark." Recognizing the threat to famous marks from free riders, this court's predecessor allowed "competitors [to] come closer" to a weak mark. *A strong mark, on the other hand, casts a long shadow which competitors must avoid.*

*Id.* (citations omitted) (emphasis added).

Based upon this respect for a famous mark, the Federal Circuit determined that the TTAB erred "in discounting the import of Kenner's famous prior mark" and in "treat[ing] that fame as a liability in assessing the likelihood of confusion." *Id.* Emphasizing that the "legal proposition is beyond debate," the Federal Circuit explained:

The driving designs and origins of the Lanham Act demand the standard consistently applied by this court—namely, *more protection for famous marks....*

... If investors forfeit legal protection by increasing a mark's fame, the law would countenance a disincentive for investments in trademarks. The law is not so schizophrenic. In consonance with the purposes and origins of trademark protection, the Lanham Act provides a broader range of protection as a mark's fame grows.

*Id.* at 353–54 (emphasis added). Thus, the Federal Circuit concluded: "In a correct assessment of the *Du Pont* factors, the fame of PLAY–DOH should have magnified the significance of these similarities." *Id.* at 355.

In addition to the fame of the PLAY–DOH mark, the Federal Circuit determined that

other factors supported a finding of likelihood of confusion. *Id.* It was explained:

The marks PLAY–DOUGH and FUN-DOUGH are used for practically identical products, namely modeling compounds and related modeling accessories. Both Kenner and Rose Art market their products in practically identical channels of trade, namely toy outlets. Kenner's lengthy and extensive use of the PLAY–DOH mark on a wide variety of toy products emphasizes the mark's fame and strength.

*Id.* Based upon these findings, the Federal Circuit concluded that FUNDOUGH, when used in connection with toy modeling compounds and related accessories "is likely to cause confusion, mistake, or deception." *Id.* at 356. Accordingly, the TTAB's dismissal of Kenner's opposition was reversed and the FUNDOUGH mark was not registered. *Id.*

The Federal Circuit expressly declined "to opine about whether 'dough' is generic in relation to water-based modeling compounds because it is unclear that the issue properly arose before the [TTAB]." *Id.* at 355 n. 2.

### D. *Subsequent Developments*

Subsequent to *Kenner I* and *Kenner II*, Rose Art sought trademark registration for its modeling clay products under the slightly different mark "FUN DOUGH." In contrast to FUNDOUGH, this proposed mark was two words, with "FUN" placed vertically on top of "DOUGH." [6] *See* Answer, Ex. A (copy of FUN DOUGH registration); *see also* Epstein Aff., ¶¶ 2, 6; Rose Art 12G Statement, ¶ 4. On 12 May 1992, the Trademark Office approved registration of the FUN DOUGH mark for "[t]oys; namely, modeling compound and related accessories for use with modeling compound sold as a unit." Answer, Ex. A; Rose Art 12G Statement, ¶ 5. The FUN DOUGH mark was given Registration No. 1,686,404. Answer, Ex. A; Rose Art 12G Statement, ¶ 5.

On 5 February 1993, Tonka filed this action. *See* Complaint at 1. Tonka alleges

---

**6.** Rose Art argues the FUN DOUGH trade dress has been "materially" altered from the trade dress for FUNDOUGH. Epstein Aff., ¶ 6; Rose Art 12G Statement, ¶ 4. This change in trade dress was allegedly effected "to avoid any charge of trade dress infringement or unfair competition." *Id.,* ¶ 4.

Rose Art's use of the FUNDOUGH and FUN DOUGH marks gives rise to three causes of action: (1) infringement of the PLAY–DOH trademark, in violation of section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);[7] (2) false designation of origin and unfair competition, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);[8] (3) and unfair competition under New Jersey common law and N.J.S.A. § 56:4–1 *et seq. See* Complaint, ¶ 1. Tonka seeks damages and injunctive relief including, *inter alia,* prohibiting Rose Art from

> [i]mitating, copying, reproducing, affixing, displaying, or using, in any manner, or making unauthorized use in any manner, of the PLAY–DOH trademark or trade dress, or of any copy, simulation, reproduction, counterfeit, variation or colorable imitation thereof, including but not limited to, the mark "FUN DOUGH," or any confusingly similar mark that contains the word "DOUGH" or "DOH" in conjunction with "FUN" or "PLAY" or any synonym thereof, and the "FUN DOUGH" trade dress, in or as part of any trademark, service mark, trade name, corporate name, or business name or offering, selling, promoting, advertising, shipping, or delivering any goods bearing any of the foregoing.

*Id.* at 12–13.

In response to the Complaint, Rose Art alleges numerous affirmative defenses and one counterclaim (the "Counterclaim").[9] Rose Art's first affirmative defense (the "First Affirmative Defense") and its Counterclaim allege that Tonka's registered trademarks "are void and unenforceable against [Rose Art] because PLAY–DOH is or has become the generic name by which the ma-

jority of the public identify the product, regardless of the source of the product." Answer at 6 (First Affirmative Defense); *see also id.* at 9 (Counterclaim, ¶ 6). Based upon the claims of genericness stated in the Counterclaim, Rose Art alleges Tonka trademarks for PLAY–DOH "should be declared invalid and be canceled." *Id.* at 10 (Counterclaim, ¶ 7).

Rose Art also alleges two affirmative defenses based upon the doctrines of acquiescence and laches. The third affirmative defense (the "Third Affirmative Defense") alleges:

> [Tonka] is estopped from asserting each and every one of [its] claims by laches and/or acquiescence, [Tonka] having been aware of the alleged activities of [Rose Art] including the use of its registered trademark FUN DOUGH in Design for well over five years without having taken any legal action against [Rose Art] to cause [Rose Art] to cease such use and [Rose Art] having relied on [Tonka's] inaction in this regard.

*Id.* at 7 (Third Affirmative Defense). Rose Art's fourth affirmative defense (the "Fourth Affirmative Defense") alleges the same defense with regard to Rose Art's use of its yellow trade dress. *Id.* at 8 (Fourth Affirmative Defense).

*Discussion*

**A.** *Construing Tonka's 12(b)(6) Motion as a Motion for Summary Judgment*

■ Tonka filed its motion in the posture of a motion to dismiss or, in the alternative, a motion for summary judgment. In support of its motion, Tonka submitted the Rickles Certification which contains factual matter

---

7. Tonka, *inter alia,* alleges:
   [Rose Art]'s use of FUN DOUGH, a trademark confusingly similar to [Tonka]'s famous-registered PLAY–DOH trademark for both identical and closely related products, infringes [Tonka]'s exclusive rights in its [F]ederally registered trademarks in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 114(1), in that members of the public are likely to be confused, deceived or mistaken regarding the source or sponsorship of [Rose Art]'s goods. Complaint, ¶ 21.

8. Tonka, *inter alia,* alleges:

[Rose Art]'s use of the trademark FUN DOUGH in connection with goods identical to and closely related to those sold under the famous PLAY–DOH trademark constitutes a false designation of origin and a false representation that [Rose Art]'s modeling compound products are offered, sponsored, authorized or licensed by or otherwise connected with [Tonka] and their quality assured thereby. Complaint, ¶ 26.

9. Jurisdiction for the Counterclaim is allegedly based upon 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202. Answer at 9 (Counterclaim, ¶ 1).

outside the pleadings. In opposition to Tonka's motion, Rose Art submitted two affidavits, numerous exhibits and a 12G statement.

It is recognized that, generally, before a motion may be converted from a motion to dismiss to a motion for summary judgment, an opportunity must be given to the parties to submit additional materials. *Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972); *Rose v. Bartle*, 871 F.2d 331, 340 (3d Cir.1989); *Panek v. Bogucz*, 718 F.Supp. 1228, 1230 (D.N.J.1989); *Harmon v. Holmes*, 712 F.Supp. 451, 452 (D.N.J.1989); *see also Jones v. Automobile Ins. Co.* 917 F.2d 1528, 1532 (11th Cir.1990); *Cincinnati Ins. Co. v. Hertz Corp.*, 776 F.Supp. 1235, 1238 (S.D.Ohio 1991); *Ospina v. Department of Corrections*, 749 F.Supp. 572, 574 (D.Del.1990). Because, however, Rose Art has been on notice since its inception that the motion, with regard to the Counterclaim, might be construed as a motion for summary judgment, and in fact appraised the motion as a summary judgment motion, Opp. Brief at 2, they will suffer no prejudice from treatment of this motion as a motion for summary judgment.

The present motion has been pending for nearly two months since oral argument. At no time since oral argument has Rose Art requested leave to file additional sworn submissions. Because Rose Art has had ample notice that this motion could be construed as a motion for summary judgment and itself relies on information contained in the matter outside the pleadings, the motion, to the extent it affects the Counterclaim, will be considered as a motion for summary judgment pursuant to Fed.R.Civ.P. 56; the affidavits, certifications and exhibits submitted by both parties are considered.

### B. *Summary Judgment Standard of Review*

■ To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion

for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inv. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("The threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" (citations omitted); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991) ("[S]ummary judgment is inappropriate when a conflict on a material fact is present in the record."); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County*, 970 F.2d 1260, 1263 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989). " 'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.'" *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party

must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

■ Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *see* Fed.R.Civ.P. 56(e); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990)

(neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

### C. *Rose Art's Counterclaim*

Tonka argues summary judgment is appropriate on the Counterclaim because the Federal Circuit has already decided, in *Kenner II,* that the PLAY–DOH trademark is entitled to broad protection under the Lanham Act. Moving Brief at 2–3. Tonka argues Rose Art is, therefore, precluded from relitigating the validity of Tonka's trademark. *Id.* Also according to Tonka, the assertion of the genericness of the PLAY–DOH trademark was a compulsory counterclaim that should have been brought during the earlier litigation. Tonka asserts that at the time of the prior litigation, Rose Art believed the PLAY–DOH mark was generic and possessed or could have possessed information upon which to base such a defense. *Id.* at 3. Because, however, Rose Art failed to assert this defense in the prior litigation and there is no evidence of changed circumstances, Tonka contends Rose Art should be precluded from defending on the basis of genericness by the doctrines of issue preclusion and claim preclusion.

In opposition, Rose Art argues it should not now be precluded from asserting that the PLAY–DOH trademark has become generic. Rose Art contends:

In the prior opposition, where the record closed December 15, 1989, there was no allegation and no proof as to the genericness of PLAY DOUGH [sic]. At that time [Rose Art] was not in possession of any fact which would have supported such an allegation. [Rose Art] did not come into possession of any such facts until February

of 1993, which was well after all proceedings in the opposition had terminated. Rose Art 12G Statement, ¶ 1; *see also* Epstein Aff., ¶ 7.

Rose Art argues it has recently received evidence that PLAY–DOH has become generic. Epstein Aff., ¶ 8. Rose Art points to three such pieces of evidence. In February 1993, Rose Art received a survey entitled the "Modeling Compound Name Study" (the "Survey") which was conducted by Guidelines Research Corp., New York, New York. The Survey reported "Play Dough" has become a generic name for modeling compounds.[10] *Id.,* Ex. 2. Also in February 1993, Rose Art received a Nexis\Lexis database search report (the "Research Report") from Research on Demand, Inc., Berkeley, California, which reflected the frequency with which "Play Dough" and "dough" were referred to in public print.[11] *Id.,* ¶ 8, Ex. 3. Finally, Rose Art describes two books published in 1989 and 1990. *Id.,* Exs. 4–5. The first book is entitled "PLAYDOUGH" and sub-titled "You and Your Child—Lots of Play Ideas for Your Children." *Id.,* ¶ 9. The second book, by Nancy Birnes, is entitled "Zap Crafts" and makes references to "Play Dough." *Id.,* ¶ 10. According to Rose Art, each of these exhibits are new facts probative of the current status of "Play Dough" and "dough" as generic. *Id.,* ¶¶ 8–9.

### D. *Preclusion*

The term res judicata has been given a variety of meanings, some of which incorporate the distinct concept of collateral estoppel. *See Gregory v. Chehi,* 843 F.2d 111, 115 (3d Cir.1988) (citing A. Vestal, Res Judicata/Preclusion, V–13 to 14 (1969)). "To reduce the confusion that resulted from the interchangeable use of these terms, the courts have refined the nomenclature used in the preclusion doctrine." *Id.* (citing *Wade v. City of Pittsburgh,* 765 F.2d 405, 408 (3d Cir.1985)). The terms "claim preclusion" and "issue preclusion" will be used in this opinion. *See Migra v. Warren City School Dist. Bd. of Education,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984); *Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 188 (3d Cir.1993); *Electro–Miniatures Corp. v. Wendon Co.,* 889 F.2d 41, 44 (3d Cir.1989); *Gregory,* 843 F.2d at 115–116; *Rider v. Pennsylvania,* 850 F.2d 982, 989 (3d Cir.), *cert. denied,* 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 582 (1988); *Pittman v. LaFontaine,* 756 F.Supp. 834, 841 (D.N.J. 1991). The term claim preclusion replaces res judicata; the term issue preclusion replaces collateral estoppel. *Edmundson,* 4 F.3d at 188; *Electro–Miniatures,* 889 F.2d at 44; *Gregory,* 843 F.2d at 116; *Pittman,* 756 F.Supp. at 841.

Claim and issue preclusion are "related but independent preclusion concepts." *Gregory,* 843 F.2d at 115. *See also Rider,* 850 F.2d at 988. These doctrines generally provide "that merits of a legal claim once decided in a court of competent jurisdiction are not subject to redetermination in another forum." *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 485, 102 S.Ct. 1883, 1899, 72 L.Ed.2d 262 (1982).

As summarized by the Supreme Court in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979):

> Under the doctrine of [claim preclusion], a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of [issue preclusion], on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

---

**10.** According to Rose Art, the Survey was a pilot study conducted at a cost of $7,850.00. Epstein Aff., ¶ 11. A more extensive study would have cost an estimated additional $29,000 to $36,000. *Id.*

**11.** The Research Report cost approximately $875.00. Epstein Aff., ¶ 11. Rose Art explains the Survey and Research Report "took the form that they did because of financial considerations—it was by no means certain, despite the threat of litigation that litigation would actually ensue." *Id.,* ¶ 12. Rose Art does not indicate what other form the Survey and Research Report might have taken if there had been no "financial considerations."

*Id.* at 326 n. 5, 99 S.Ct. at 649 n. 5 (citing 1B J. Moore, Moore's Federal Practice ¶ 0.405(1) at 622–624 (2d ed. 1974)). Both doctrines " 'shar[e] the common goals of judicial economy, predictability and freedom from harassment....' " *Electro–Miniatures Corp.*, 889 F.2d at 44 (quoting *Gregory*, 843 F.2d at 116). "Absent significant changes in controlling facts or legal principles or other special circumstances, the prior resolution of issues is conclusive." *In re Convertible Rowing Exerciser Patent Litigation*, 814 F.Supp. 1197, 1202 (D.Del.1993).

Although issue and claim preclusion are similar, they have different consequences. "Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit." *McNasby v. Crown Cork and Seal Co.*, 888 F.2d 270, 275 (3d Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990) (citing *Migra*, 465 U.S. at 77 n. 1, 104 S.Ct. at 894 n. 1). "Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." *Id.*, n. 7 (citing *Migra*, 465 U.S. at 77 n. 1, 104 S.Ct. at 894 n. 1).

### 1. *Issue Preclusion*

■ Issue preclusion "embodies the principle that 'later courts should honor the first actual decision of a matter that has actually been heard and litigated.' " *Rider*, 850 F.2d at 989 (quoting C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4416 at 136 (1981)). "By precluding a court from making a second determination as to an issue on which an earlier court has previously rendered a decision, the doctrine of issue preclusion assists in the 'maintenance of the social order' and 'secure[s] the peace and repose of society by the settlement of matters capable of judicial determination.' " *Id.* (quoting *Southern Pacific Railroad v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)).

■ Issue preclusion "precludes the relitigation of an issue that has been put in issue and directly determined adversely to the party against whom the estoppel is asserted."

*Melikian v. Corradetti*, 791 F.2d 274, 277 (citing *New Jersey–Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education*, 654 F.2d 868, 876 (3d Cir.1981)); *State v. Gonzalez*, 75 N.J. 181, 380 A.2d 1128 (1977)). Issue preclusion does not extend to collateral issues nor to matters inferred from the judgment. *Id.* The doctrine of issue preclusion may be invoked where:

(1) the identical issue was decided in a prior adjudication;

(2) there was a final judgment on the merits;

(3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and

(4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question [in the prior matter].

*Board of Trustees of Trucking Employees of New Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 505 (3d Cir.1992) (citing *Temple University v. White*, 941 F.2d 201, 212 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992)); *see Gregory*, 843 F.2d at 121. The issue must have been " 'distinctly put in issue' and 'directly determined' adversely to the party against which the estoppel is asserted." *New Jersey–Philadelphia Presbytery*, 654 F.2d at 876 (quoting *City of Plainfield v. Public Service Gas and Electric*, 82 N.J. 245, 257–58, 412 A.2d 759 (1980)).

■ "[I]ssue p]reclusion cannot be avoided simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first." *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254–55 (D.C.Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993). If there is more than one ground for the prior judgment, none of which were expressly relied upon, the prior judgment may not have preclusive effect in the subsequent action because it may not be discernable by the subsequent court which issues were actually litigated in the prior action. *New Jersey–Philadelphia Presbytery*, 654 F.2d at 876

(citing *Ettin v. Ava Truck Leasing Inc.*, 53 N.J. 463, 480–81, 251 A.2d 278 (1969)).

■ In the present case, it is undisputed that the prior litigation culminated in a final judgment on the merits and involved the same parties. Issue preclusion, however, only bars relitigation of an issue if it is identical to an issue decided in a prior adjudication after a full and fair opportunity to litigate the issue. *Centra*, 983 F.2d at 505.

In this case, whether the PLAY–DOH trademark was generic was *not* "distinctly put in issue" by Rose Art and was *not* "directly decided" in the prior litigation. *See New Jersey–Philadelphia Presbytery*, 654 F.2d at 876. Although the decision in *Kenner II* implicitly recognizes the validity of the PLAY–DOH trademark, a decision on the issue of genericness may only be inferred from the outcome of the prior litigation. This is not sufficient to invoke the bar of issue preclusion. *See Gonzalez*, 75 N.J. 181, 380 A.2d 1128. Accordingly, Rose Art's Counterclaim is not barred by issue preclusion.

### 2. Claim Preclusion

■ Claim preclusion rules formulated by courts are "designed to draw a line between the meritorious claim[s] on the one hand and the vexatious, repetitious and needless claim[s] on the other hand." *Purter v. Heckler*, 771 F.2d 682, 689–90 (3d Cir.1985). It "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979). Litigation should not be renewed after a case has been fully presented before a court and the matter has been decided against a litigant. *Id.*

■ The doctrine of claim preclusion "gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding." *Centra*, 983 F.2d at 504. To invoke claim preclusion, there must have occurred:

(1) [A] final judgment on the merits in a prior suit involving; (2) the same parties

or their privities; and (3) a subsequent suit based on the same cause of action.

*Id.* To characterize two causes of action as the same for claim preclusion purposes, a court should consider (1) whether the wrong for which redress is sought is the same in both actions (that is, whether the acts complained of and the demand for relief are the same), (2) whether the theory of recovery is the same, (3) whether the witnesses and documents necessary at trial are the same and (4) whether the material facts alleged are the same. *Culver v. Insurance Co. of North America*, 115 N.J. 451, 461–62, 559 A.2d 400 (1989) (citations omitted); *Facchiano Constr. Co., Inc. v. U.S. Dept. of Labor*, 987 F.2d 206, 212 (3d Cir.1993).

■ A potential defense which was either raised in a prior proceeding, or should have been, is waived under claim preclusion principles. *Edmundson*, 4 F.3d at 189–90; *Wheeler v. Nieves*, 762 F.Supp. 617, 625 (D.N.J. 1991) (citing *McNasby*, 888 F.2d at 275).

■ In the instant case, Tonka contends Rose Art is precluded from litigating the issue of the genericness of the PLAY–DOH mark by the opposition proceedings in *Kenner I* and *Kenner II*.

The issue of whether a determination in a registration opposition or cancellation proceeding has claim-preclusive effect in a subsequent infringement suit has not yet been decided by the Third Circuit. The weight of authority, and the rationale for claim preclusion, however, indicate that a denial of an application for registration of a trademark does not have claim-preclusive effect in a subsequent suit for infringement of the mark.

■ The administrative status of the TTAB is not determinative of this issue. It is acknowledged that an administrative proceeding may have preclusive effect in a subsequent district court action. As the Supreme Court has stated: "When an administrative agency is acting in a judicial capacity and resolves disputes properly before it which the parties had an adequate opportunity to litigate, the courts have not hesitated to apply [claim preclusion] to enforce repose."

*United States v. Utah Construction Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Moreover, in the instant case, the Trademark Office decision was reviewed by the Federal Circuit, which is indisputably an Article III court. *See* 28 U.S.C. § 41 (listing Federal Circuit among "thirteen judicial circuits of the United States"); *Brenner v. Manson*, 383 U.S. 519, 526, 86 S.Ct. 1033, 1037, 16 L.Ed.2d 69 (1965) (Court of Customs and Patent Appeals ("CCPA"), predecessor of Federal Circuit, is "Article III court [and is] 'judicial' in character").

The dispositive factor in determining this issue is the identity of a registration proceeding with an infringement suit. If the two claims are not the same, claim preclusion cannot apply, regardless of the status of the court hearing the registration proceeding. *See Centra*, 983 F.2d at 504.

Applying the factors enumerated in *Facchiano*, 987 F.2d at 212, it appears a registration proceeding does not present the same cause of action as an infringement suit for claim preclusion purposes. Registration proceedings present the question of whether the applicant is entitled to register its trademark; an infringement suit presents the issue of entitlement to use a mark. *See Flavor Corp. of America v. Kemin Industries, Inc.*, 493 F.2d 275, 279–80 (8th Cir.1974) ("The legal issue in a cancellation proceeding is the right to register a mark. . . . The issue in an infringement action is whether the *use* of the respective marks in commerce results in infringement." (emphasis in original)).

Though the questions sound similar, they are not the same for claim preclusion purposes. It is well-established that the entitlement to register a trademark, or lack thereof, is not dispositive of the entitlement to use of the trademark for the purposes of an infringement action.[12] *See* 15 U.S.C. § 1115(a) (Registration "shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive

right to use the registered mark . . . but shall not preclude another person from proving any legal or equitable defense . . . which might have been asserted if such mark had not been registered."); *Ford Motor Co. v. Summit Motor Products*, 930 F.2d 277, 291 (3d Cir.) (stating that unregistered trademark may be protectable in an infringement action, and registered trademark may not be protectable), *cert. denied*, —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986) ("Federal courts have long held that § 43(a) of the Lanham Act extends protection [against infringement] to unregistered trademarks."); *Bambu Sales, Inc. v. A & M Distributing*, No. 87–1055, 1988 WL 68923 at *1 (D.N.J. 29 June 1988) ("[R]egistration does not assure the protection of a trademark in an infringement action."); *Dominion Bankshares Corp. v. Devon Holding Co., Inc.*, 690 F.Supp. 338, 347 (E.D.Pa.1988) ("The registration by defendants of the [trademark with the state] has no effect on the infringement rights of the plaintiff."); *Nabisco Brands, Inc. v. Quaker Oats Co.*, 547 F.Supp. 692, 697 (D.N.J.1982) (Registration of mark, while prima facie evidence of registrant's exclusive right to use, is subject to rebuttal by any means which would have been available if mark had not been registered.).

Consequently, the remedies available in registration or cancellation proceedings differ from those available in infringement suits. In infringement suits, the remedies available include damages and injunction against infringement. *See* 15 U.S.C. § 1116 (providing for injunction against infringement); 15 U.S.C. § 1117 (providing for damages and other penalties). A registration or cancellation proceeding, on the other hand, can only result in registration or cancellation of the mark at issue. *See* 15 U.S.C. § 1068 (listing remedies available; including only registration, cancellation or restriction of

12. One commentator has elaborated:

It is important to keep in mind that what is in issue in a cancellation proceeding is the cancellation of a *registration*, not the cancellation of a trademark. Although a [F]ederal registration will give the owner of a mark important legal rights and benefits, the registration does

not create the trademark. Thus, the cancellation of a registration does not invalidate state or [F]ederal rights in the trademark which do not flow from federal registration.

2 McCarthy on Trademarks and Unfair Competition § 20.12[1] (3d ed. 1992) (emphasis in original).

marks "with respect to the register"); 15 U.S.C. § 1071 (listing remedies available upon appeal to Federal Circuit: "The court may adjudge that an applicant is entitled to a registration upon the application involved, that a registration involved, or such other matter as the issues in the [registration or cancellation] proceedings require.").

As stated, such registration or cancellation is not determinative of the right to relief in an infringement proceeding. *See Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 819 (1987) ("A refusal by the [Trademark Office] to register a mark does not preclude the owner of the mark from his right to use it." (quoting *In re McGinley*, 660 F.2d 481 (C.C.P.A.1981)); *Murphy Door Bed Co. v. Interior Sleep Systems*, 687 F.Supp. 754, 762 (E.D.N.Y.1988) (same; citing *Wheeler*, 814 F.2d at 819), *aff'd in part, rev'd in part on other grounds*, 874 F.2d 95 (2d Cir.1989); *Irving–Cloud Publishing Co. v. Chilton Co.*, 463 F.Supp. 476, 479 (E.D.Pa. 1978) ("[T]he administrative decision of the [TTAB] to cancel a trademark from the Supplemental Register does not enjoin the subsequent use of that mark in commerce."). This difference in available remedies militates strongly against finding claim preclusion in the instant case. *See Facchiano*, 987 F.2d at 212; *Jim Beam Brands Co. v. Beamish & Crawford, Ltd.*, 937 F.2d 729, 736 (2d Cir.1991) ("If an injunction against trademark infringement was not available ... in the TTAB/Federal Circuit proceeding, obviously res judicata would not apply."), *cert. denied*, —— U.S. ——, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992).

Because of the difference in the issues presented by registration proceedings and infringement suits, the two proceedings involve different material facts. One commentator has noted: "[A] determination of a likelihood of confusion in the context of an opposition or cancellation and its review on appeal may sometimes bear little relevance to the issues presented in a subsequent infringement suit." 3 McCarthy on Trademarks and Unfair Competition § 32.31[2] (3d ed. 1992). This difference in material facts also weighs against finding claim preclusion based on *Kenner I* and *Kenner II*. *See Facchiano*, 987 F.2d at 212.

For these reasons, several courts have refused to allow registration opposition proceedings to have claim preclusive effect on subsequent infringement suits involving the same trademark. *See Flavor Corp.*, 493 F.2d at 279 ("[R]es judicata is inapplicable because an infringement action and a cancellation proceeding are different causes of action."); *American Angus Association v. Sysco Corporation*, 829 F.Supp. 807, 824 (W.D.N.C. 1993) (in infringement action, refusing to give preclusive effect to opposition proceedings in part because "[d]ecisions ... concerning whether a mark is to be registered may not interfere with the common law right to use the trademark in any event").[13]

Turning to the facts at bar, Tonka cannot use claim preclusion to bar Rose Art's Counterclaim. *Kenner I* and *Kenner II* involved registration opposition proceedings only; no infringement action was involved. *See supra* at 204–206. For the purposes of claim preclusion, a registration opposition does not present the same claim as an infringement suit. *See Bambu Sales*, 1988 WL 68923 at *1. Accordingly, Rose Art's failure to raise a

---

**13.** *See also West Indian Sea Island Cotton Association v. Threadtex*, 761 F.Supp. 1041, 1053 (S.D.N.Y.1991) ("It is apparent that a registration proceeding does not involve the same claim as an action alleging false advertising and fraud. Accordingly, the doctrine of res judicata does not apply to preclude plaintiff's claims." (citations omitted)); *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, No. 89 CIV. 5835, 1990 WL 160891 at *1 (S.D.N.Y. 15 Oct. 1990) (refusing to apply claim preclusion because "the cause of action in a cancellation proceeding, in which a party's right to register a trademark is determined, is significantly different from that in an infringement action in which a party's right to

use a trademark is determined."), *vacated on other grounds*, 937 F.2d 729 (2d Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992); *Irving–Cloud Publishing Co.*, 463 F.Supp. at 479 ("[T]he decisions of the [TTAB] to cancel trademarks are not binding upon a court of equity in litigation to determine the rights of usage of trademarks." (citation omitted)); *Questor Corp. v. Wold Industries, Inc.*, 194 U.S.P.Q. 141, 143 (D.Minn.1976) ("The value of a ... determination of the right to register is further limited by the fact that such determination is not res judicata or binding on this court in this [infringement] suit.").

counterclaim based on genericness in *Kenner I* and *Kenner II* does not bar through claim preclusion its assertion of the Counterclaim here. *See Centra*, 983 F.2d at 504; *Flavor Corp.*, 493 F.2d at 279.

■ This conclusion does not affect the applicability in infringement suits of issue preclusion with respect to issues actually decided by the TTAB or the Federal Circuit in registration or cancellation proceedings.[14] *See EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.*, 746 F.2d 375, 379 (7th Cir. 1984) (in infringement suit, applying issue preclusion to Federal Circuit's determination of likelihood of confusion in opposition proceeding); *Flavor Corp.*, 493 F.2d at 279 (in infringement suit, refusing to apply claim preclusion, but applying issue preclusion to CCPA's determination of likelihood of confusion in cancellation proceeding). *But see Jim Beam Brands*, 937 F.2d at 735 (refusing to apply issue preclusion to Federal Circuit's finding of likelihood of confusion in cancellation proceeding because "[t]hough worded similarly, the issue of likelihood of confusion in a cancellation proceeding may be different from the issue of likelihood of confusion in an action for infringement").

Where issue preclusion is concerned, only identity of issues, not identity of claims, is required. *See Centra*, 983 F.2d at 505. If the TTAB or Federal Circuit actually decides an issue in an opposition proceeding, identity of claims is not necessary for those findings to be accorded conclusive effect in an infringement proceeding. *See id.* Therefore, the conclusion that opposition proceedings and infringement suits do not present the same claims does not bar the application of issue preclusion between the two types of proceedings. As stated, however, issue preclusion is inapplicable to Rose Art's Counterclaim because the issue of genericness was not distinctly decided in the opposition proceedings. *See supra* at 212.

■ This conclusion also does not diminish the great deference to be accorded to factual findings actually made by the TTAB

in opposition proceedings. Even in the absence of issue or claim preclusion, factual findings of the TTAB "will control in a subsequent infringement suit unless the contrary is established by evidence that, in character and amount, carries 'thorough conviction.' " *Freedom Savings and Loan Association v. Way*, 757 F.2d 1176, 1181 (11th Cir.1985) (refusing to give TTAB findings issue preclusive or claim preclusive effect), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985); *see Driving Force, Inc. v. Manpower, Inc.*, 498 F.Supp. 21, 25 (E.D.Pa.1980) ("Even though decisions of the Trademark Office are not binding in regard to litigation in the courts on the same or related issues, a decision .. must be accepted as controlling unless the contrary is established by evidence which in character and amount carries thorough conviction."); *Johnson & Johnson v. Colgate–Palmolive Co.*, 345 F.Supp. 1216, 1221 (D.N.J.1972) ("[A] decision of the [Trademark Office] as to confusing similarity of the two marks must be accepted as controlling, unless the contrary is established by evidence which in character and amount carries thorough conviction."). In the instant case, however, the opposition proceedings did not result in a determination as to the alleged genericness of the PLAY–DOH trademark. Accordingly, the factual findings in *Kenner I* do not provide a basis for disposing of Rose Art's Counterclaim.

### 3. *Compulsory Counterclaim Rule*

■ Tonka contends Rose Art's Counterclaim is barred because it was a compulsory counterclaim in the opposition proceedings. *See* Moving Brief at 13–16. Tonka argues that this provides an independent basis for giving *Kenner I* and *Kenner II* preclusive effect over Rose Art's Counterclaim in the instant action. *See id.*

Tonka argues the Counterclaim was compulsory under both the rules of the Trademark Office and the Federal Rules of Civil Procedure. *See id.* The Trademark Office compulsory counterclaim rule provides that

---

14. Moreover, TTAB or Federal Circuit opposition proceedings may have claim preclusive effect on opposition proceedings before district courts. As stated, it is the difference between an infringe-

ment claim and an opposition action which bars claim preclusion in the instant case, and not the difference between the courts involved. *See supra* at 213.

"[a] defense attacking the validity of any one or more of the registrations pleaded in the opposition shall be a compulsory counterclaim." 37 C.F.R. 2.106(b)(2)(i). Rule 13(a) of the Federal Rules of Civil Procedure provides:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the same transaction and occurrence that is the subject matter of the opposing party's claim....

Fed.R.Civ.P. 13(a).

Tonka is correct to the extent that if Rose Art had the opportunity to bring a compulsory counterclaim in the opposition proceedings, and failed to do so, such counterclaim would be barred in the instant action. *See Baker v. Gold Seal Liquors,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974) ("A counterclaim which is compulsory but is not brought is thereafter barred.").

Tonka's argument in this regard, however, assumes Rose Art was entitled to assert its Counterclaim in the opposition proceedings, and that the relief the Counterclaim now seeks would have been available in the opposition proceedings. *See Akin v. PAFEC Ltd.,* 991 F.2d 1550, 1562 (11th Cir.1993) (counterclaims not compulsory where "the claims were not yet available" in the prior proceedings); *General Teamsters, Chauffeurs, Helpers and Warehousemen Union of America v. Lawrence–Mercer County Builders Association,* 88 F.R.D. 644, 645 (W.D.Pa. 1980) (holding counterclaim compulsory because it could have been raised in prior proceeding, and should have been raised there); *see also Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir.1961) (purpose of compulsory counterclaim rule is to prevent duplicative litigation).

It appears the sole relief at stake in the opposition proceedings was whether Rose Art was entitled to register the FUNDOUGH trademark. Had Rose Art successfully asserted the genericness of the PLAY–DOH trademark as a counterclaim in those proceedings, it would only have been entitled to the registration of the FUNDOUGH trademark, not necessarily to its use. *See* Complaint, ¶ 16. In the instant proceedings, on the other hand, Rose Art's success in its Counterclaim would entitle it to the use of the FUNDOUGH mark. As stated, registration of a trademark is not dispositive of the registrant's right to use the mark. *See Dominion Bankshares,* 690 F.Supp. at 347 ("The registration by defendants of the [trademark with the state] has no effect on the infringement rights of the plaintiff."); *Nabisco Brands,* 547 F.Supp. at 697 (D.N.J. 1982) (Registration of mark, while prima facie evidence of registrant's exclusive right to use, is subject to rebuttal by any means which would have been available if mark had not been registered.).

Similarly, it appears that if Rose Art had successfully asserted the genericness of the PLAY–DOH trademark in the opposition proceedings, the sole effect on the PLAY–DOH mark would have been to invalidate its registration. *See* 37 C.F.R. 2.106(b)(2)(i) (defining compulsory counterclaim as "defense attacking the validity of any one or more of the registrations pleaded in the opposition"). In the instant case, Rose Art's success in its Counterclaim would render the PLAY–DOH mark unprotectable against infringement. *See A.J. Canfield Co.,* 808 F.2d at 297 ("[I]f we hold a designation generic, it is never protectable...."). As noted, the registrability of the PLAY–DOH mark is not determinative of its whether it is protectable against infringement. *See Ford Motor Co.,* 930 F.2d at 291; *A.J. Canfield Co.,* 808 F.2d at 296. Therefore, the relief sought by the Counterclaim was not available in the opposition proceedings.

Rose Art's Counterclaim, as it is here asserted, and with the relief it now seeks, could not have been brought in the opposition proceedings. It was therefore not a compulsory counterclaim in those proceedings. Accordingly, Rose Art's Counterclaim is not barred by the compulsory counterclaim rule.

This conclusion does not, as Tonka suggests, "make a mockery of the compulsory counterclaim rule of Fed.R.Civ.P. 13(a) and Trademark Rule 2.106(b)(2)(i)." Reply Brief at 10. Were this an opposition or

cancellation proceeding, instead of an infringement proceeding, the compulsory counterclaim rule might apply. *See Vitaline Corp. v. General Mills, Inc.*, 891 F.2d 273, 276 (Fed.Cir.1989). It is the difference in the remedies available in the instant infringement action and those available in *Kenner I* and *Kenner II* which renders the compulsory counterclaim rule inapplicable in the instant case. Indeed, it would be inconsistent with the purpose of the compulsory counterclaim rule to bar as compulsory a counterclaim which could not have been brought in the prior proceeding. *See Great Lakes Rubber*, 286 F.2d at 634 (purpose of compulsory counterclaim rule is to prevent duplicative litigation).

Tonka offers several cases in support of its contention that Rose Art's Counterclaim was compulsory in the opposition proceedings. *See* Moving Brief at 14–15. All of these cases, however, involved only opposition or cancellation proceedings, and not infringement suits. Counterclaims were held to be compulsory in prior opposition or cancellation proceedings, and were therefore barred. *See Vitaline Corp. v. General Mills, Inc.*, 891 F.2d 273 (Fed.Cir.1989); *Libertyville Saddle Shop, Inc. v. E. Jeffries & Sons Ltd.*, 24 U.S.P.Q.2d 1376 (T.T.A.B.1992); *Consolidated Foods Corp. v. Big Red, Inc.*, 231 U.S.P.Q. 744 (T.T.A.B.1986).

Because each of Tonka's precedents were opposition or cancellation proceedings, the counterclaims there at issue could only have served to invalidate the registration of the opposer, and entitle the applicant to registration of its mark. The counterclaims asserted in those cases could not have rendered the opponent's mark unprotectable against infringement or given the applicant the right to use its mark. *See Ford Motor Co.*, 930 F.2d at 291. Therefore, in each of Tonka's precedents, the counterclaim asserted was available in the prior opposition or cancellation proceeding. Rose Art's Counterclaim, as stated, was not available in *Kenner I* or *Kenner II*. Accordingly, Tonka's precedents are easily distinguishable from the instant circumstances, and will not be followed.

Rose Art's Counterclaim is not barred by issue preclusion, claim preclusion or the com-

pulsory counterclaim rule. Tonka argues no other basis for granting it summary judgment on Rose Art's Counterclaim. A genuine issue of material fact exists as to whether Rose Art can succeed on its Counterclaim. Accordingly, Tonka's motion for summary judgment on the Counterclaim is denied.

### E. *Motion to Strike Affirmative Defenses*

Rule 12(f) of the Federal Rules of Civil Procedure provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.Civ.P. 12(f) (emphasis added). "An affirmative defense is insufficient is it is not recognized as a defense to the cause of action." *Total Containment, Inc. v. Environ Products, Inc.*, No. 91–7911, 1992 WL 208981 at *1 (E.D.Pa. 19 Aug. 1992).

■■■ "A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)." *River Road Devel. Corp. v. Carlson Corp.*, No. 89–7037, 1990 WL 69085 at *2 (E.D.Pa. 23 May 1990). Motions to strike, however, are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Id.* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1382 (1969)); *see also Federal Deposit Insurance Corp. v. White*, 828 F.Supp. 304, 307 (D.N.J.1993) (citing *Cipollone v. Liggett Group*, 789 F.2d 181, 188 (3d Cir.1986); *Glenside West Corp. v. Exxon Corp.*, 761 F.Supp. 1100, 1115 (D.N.J. 1991)).

"Partly because of the practical difficulty of deciding cases without a factual record it is well established that striking a pleading should be sparingly used by courts. It is a drastic remedy to be resorted to only when required for the purposes of justice." *United States v. Consolidation Coal Co.*, No. 89–2124, 1991 WL 333694 at *1 (W.D.Pa. 5 July 1991). "[A] court should not grant a motion to strike a defense unless the insufficiency of the defense is 'clearly apparent.'" *White*, 828 F.Supp. at 307 (quoting *Cipollone*, 789 F.2d at 188).

A motion to strike will not be granted where the sufficiency of a defense depends on disputed issues of fact. *United States v. Marisol, Inc.*, 725 F.Supp. 833, 836 (M.D.Pa.1989); *Linker v. Custom–Bilt Mach., Inc.*, 594 F.Supp. 894, 898 (E.D.Pa. 1984). Even where the facts are not in dispute, Rule 12(f) is not meant to afford an opportunity to determine disputed and substantial questions of law. *Heller Fin. Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1295 (7th Cir.1989); *Glenside West Corp.*, 761 F.Supp. at 1115; *Marisol, Inc.*, 725 F.Supp. at 837. Motions to strike save time and expense, however, by making it unnecessary to litigate claims which will not affect the outcome of the case. *See United States v. Kramer*, 757 F.Supp. 397, 410 (D.N.J.1991); *Consolidation Coal*, 1991 WL 333694 at *1; *Marisol, Inc.*, 725 F.Supp. at 836.

Motions to strike are to be decided "on the basis of the pleadings alone." *Total Containment*, 1992 WL 208981 at *1. "An affirmative defense can be stricken 'only if the defense asserted could not possibly prevent recovery under any pleaded or inferable set of facts.'" *Linker v. Custom–Bilt Machinery, Inc.*, 594 F.Supp. 894, 898 (E.D.Pa. 1984) (quoting *United States v. Pennsalt Chemical Corp.*, 262 F.Supp. 101 (E.D.Pa. 1967)).

### 1. *First Affirmative Defense*

Rose Art's First Affirmative Defense alleges Tonka's PLAY–DOH trademark is generic and is therefore "void and unenforceable." Answer at 6. If Rose Art is able to prove the PLAY–DOH mark is generic, the PLAY–DOH mark must be deemed unprotectable against infringement. *See A.J. Canfield Co.*, 808 F.2d at 297. Rose Art's proof of the genericness of the PLAY–DOH mark would therefore be a sufficient defense to Tonka's infringement action.

The only argument Tonka advances for striking the First Affirmative Defense is that it, being identical to the Counterclaim, is barred by the doctrines of issue preclusion and claim preclusion. As stated, the doctrines of issue preclusion and claim preclusion do not bar Rose Art from arguing the genericness of the PLAY–DOH trademark in the instant case. *See supra* at 211–212.

Tonka has asserted no other basis for striking the First Affirmative Defense. Rose Art's assertion of the First Affirmative Defense is therefore not "redundant, immaterial, impertinent, or scandalous" for the purposes of Rule 12(f). Fed.R.Civ.P. 12(f); *see White*, 828 F.Supp. at 307. Accordingly, Tonka's motion to strike Rose Art's First Affirmative Defense is denied.[15]

### 2. *Third and Fourth Affirmative Defenses*

Rose Art's Third Affirmative Defense alleges Tonka is estopped from claiming against Rose Art's use of the FUNDOUGH trademark by the doctrines of acquiescence and laches. *See* Answer at 7. Rose Art's Fourth Affirmative Defense alleges Tonka is estopped from claiming against Rose Art's use of its yellow trade dress by the doctrines of acquiescence and laches. *See id.* at 8.

#### a. *Acquiescence*

"The equitable defense of acquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert [its] trademark rights against the defendant." *Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1140 (D.N.J.1993); *see Estate of Presley v. Russen*, 513 F.Supp. 1339, 1351 (D.N.J.1981).

Here, Rose Art alleges Tonka failed to notify Rose Art of Tonka's rights against infringement "for well over five years" after Tonka became aware of Rose Art's use of the FUNDOUGH mark. Answer at 7–8. Rose Art alleges Tonka's failure in this regard

---

**15.** In light of this conclusion, it is unnecessary to reach Rose Art's contention that Tonka's motion to strike the First Affirmative Defense should be denied because it relies on facts outside the pleadings. *See* Opp. Brief at 2. Tonka has been denied summary judgment on the Counterclaim.

*See supra* at 217. Even if all facts in the record are considered, Rose Art's assertion of the genericness of the PLAY–DOH trademark is not barred by any of the preclusion doctrines relied upon by Tonka.

constitutes acquiescence on Tonka's part. *See id.*

Rose Art began using the FUNDOUGH trademark in January 1986. *See Kenner I*, slip op. at 5. The pleadings indicate Rose Art began commercial shipments of products bearing the FUNDOUGH trademark "in or about August 1987." Answer at 3; Complaint at 6. More than five years passed between that time and the institution of these proceedings.

The pleadings further indicate, however, that Tonka filed its opposition to Rose Art's registration of its FUNDOUGH mark on 5 December 1986, less than one year after Rose Art began using the FUNDOUGH mark. Tonka's filing of opposition was, moreover, several months before Rose Art commenced commercial shipments of FUNDOUGH products. *See* Answer at 3; Complaint at 7.

While Tonka's filing of opposition to FUNDOUGH's registration was something less than bringing an infringement action, it did indicate Tonka's protest of Rose Art's use of the FUNDOUGH mark. *See Alfred Dunhill v. Kasser Dist. Prod. Corp.*, 350 F.Supp. 1341, 1367 (E.D.Pa.1972) ("While a successful opposition only acts to prevent registration and not use, as a practical matter, it puts the defendant on notice that, at the least, the plaintiff is not going to 'sleep on its rights,' and indeed, in our view, goes even further and puts defendant on notice that the opposer also protests its use of the confusingly similar mark."), *aff'd without op.*, 480 F.2d 917 (3d Cir.1973). In light of Tonka's filing of opposition in *Kenner I*, its failure to bring this action until now did not constitute an assurance to Rose Art, express or implied, that Tonka would not bring suit against the infringement of its PLAY–DOH mark. *See Birthright*, 827 F.Supp. at 1139. From the face of the pleadings, it appears Rose Art could not succeed in a defense based on acquiescence in the instant action. *See Linker*, 594 F.Supp. at 898. Accordingly, Tonka's motion to strike Rose Art's Third and Fourth Affirmative Defenses is granted to the extent those defenses are based on the doctrine of acquiescence.

#### b. *Laches*

The defense of laches consists of "two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from the delay." *University of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040, 1044 (3d Cir.) (citing *Sobosle v. United States Steel Corp.*, 359 F.2d 7, 12–13 (3d Cir.1966)), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982).

The defense of laches is recognized as a valid defense to an action for trademark infringement. *See University of Pittsburgh*, 686 F.2d at 1044; *Transfer Print Foils, Inc. v. Transfer Print of America, Inc.*, 720 F.Supp. 425, 440 (D.N.J.1989). However, "the laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence." *Estate of Presley*, 513 F.Supp. at 1351; *see Resorts International, Inc. v. Greate Bay Hotel & Casino*, No. 90–3057, 1991 WL 352487 at *26 (D.N.J. 18 Jan. 1991). "Even if proven, laches generally will bar a claim for an accounting of past infringement but not a claim for prospective injunctive relief." *Birthright*, 827 F.Supp. at 1140; *see University of Pittsburgh*, 686 F.2d at 1044.

While the laches defense is narrow, such a defense should generally not be disposed of in pretrial motions. As the Third Circuit has stated:

> [B]ecause the correct disposition of the equitable defense of laches can only be made "by a close scrutiny of the particular facts and balancing of the respective interests and equities of the parties, as well as of the general public," 2 J. McCarthy, Trademarks and Unfair Competition 573 (2d ed. 1984), it usually requires the kind of record only created by full trial on the merits.

*Country Floors v. Partnership of Gepner and Ford*, 930 F.2d 1056, 1066 (3d Cir.1991) (denying summary judgment on issue of laches in trademark infringement claim).

Turning to the facts at bar, the determination as to the sufficiency of Rose Art's assertion of the defense of laches is confined to

the pleadings. *See Total Containment*, 1992 WL 208981 at *1. Moreover, the parties' affidavits relate only to the Counterclaim and the First Affirmative Defense. Therefore, even if the record were considered, there would be no facts outside the pleadings upon which to rule on the issue of laches.

As a result, issues of fact are in dispute. The pleadings indicate Rose Art commenced commercial distribution of FUNDOUGH products in August 1987. *See* Complaint at 6. However, neither the pleadings nor the affidavits submitted indicate when Tonka first learned of this distribution. Therefore, it is not possible to determine from the relevant facts whether Tonka's delay in bringing this action was unreasonable or undue.

It is, moreover, unclear whether and to what extent Rose Art may have been prejudiced by such delay. Tonka argues that the mere production by Rose Art of allegedly infringing products does not constitute prejudice for the purpose of laches. *See* Moving Brief at 20 (citing *Alfred Dunhill*, 350 F.Supp. at 1368). However, it is reasonable to infer that at trial Rose Art could prove other prejudice resulting from Tonka's delay. *See Linker*, 594 F.Supp. at 898 (all reasonable inferences must be drawn from pleadings). The existence of these issues of fact weighs strongly against striking the Third and Fourth Affirmative Defenses as they relate to laches. *See Marisol, Inc.*, 725 F.Supp. at 836.

At least one disputed issue of law also exists. Tonka contends the period during which a defense of laches would accrue was tolled during the pendency of the opposition proceedings. Moving Brief at 18–19. Rose Art counters that the opposition proceedings did not toll the laches period. *See* Opp. Brief at 22.

In fact, there appears to be some disagreement among courts as to whether the pendency of opposition proceedings tolls the laches period in an infringement action. *Compare, e.g., James Burrough Ltd. v. Sign*

*of Beefeater, Inc.*, 572 F.2d 574, 578 & n. 5 (7th Cir.1978) (refusing to toll laches period during pendency of opposition proceedings) *and Oreck Corp. v. Thomson Consumer Electronics, Inc.*, 796 F.Supp. 1152, 1162 (S.D.Ind.1992) (registration of mark by trademark licensee gave licensor notice of breach of license agreement and began running of laches period) *with Alfred Dunhill*, 350 F.Supp. at 1367 (tolling laches period during pendency of opposition proceeding) *and Citibank, N.A. v. Citytrust*, 644 F.Supp. 1011, 1014 (E.D.N.Y.1986) (same). Tonka itself acknowledges this dispute in authority when it characterizes its position as representing "the weight of authority." Reply Brief at 14. The existence of this disputed issue of law militates against striking the Third and Fourth Affirmative Defenses as they relate to the defense of laches. *See Glenside West Corp.*, 761 F.Supp. at 1115.

Rose Art's assertion of the defense of laches is not "redundant, immaterial, impertinent, or scandalous" for the purposes of Rule 12(f). Fed.R.Civ.P. 12(f); *see White*, 828 F.Supp. at 307. Accordingly, those parts of the Third and Fourth Affirmative defenses which are based on the doctrine of laches will not be stricken.[16]

*Conclusion*

For the reasons set forth above, Tonka's motion for summary judgment on Rose Art's Counterclaim is denied. Tonka's motion to strike Rose Art's First Affirmative Defense is denied. Tonka's motion to strike Rose Art's Third and Fourth Affirmative Defenses is granted to the extent those defenses are based on the doctrine of acquiescence, and denied to the extent those defenses are based on the doctrine of laches.

---

16. Tonka argues Rose Art's "intentional copying of [Tonka's] name and trade dress, as found by the Federal Circuit, precludes its assertion of laches." Moving Brief at 21. There is, however, no indication in *Kenner II* that the Federal Circuit even considered the issue of intentional copying, much less that they made a finding on the issue. *See Kenner II*, 963 F.2d 356. Tonka's argument in this regard is therefore rejected.